Leonard JEFFRIES, Plaintiff–Appellee,

v.

Bernard HARLESTON, individually and in his official capacity as president of City College of New York, W. Ann Reynolds, individually and in her official capacity as Chancellor of City University of New York, James P. Murphy, Edith B. Everett, Herman Badillo, Sylvia Bloom, Gladys Carrion, Louis C. Cenci, Michael J. Del Guidice, Stanley Fink, William R. Howard, Harold M. Jacobs, Susan Moore Mouner, Calvin O. Pressley, and Thomas Tam, individually and in their official capacities as Trustees of City University of New York, Defendants–Appellants,

Blanche Bernstein, Defendant.

No. 953, Docket 93–7876.

United States Court of Appeals, Second Circuit.

Argued Jan. 21, 1994.

Decided April 18, 1994.

Kathie Ann Whipple, Deputy Bureau Chief, Office of Atty. Gen. (Robert Abrams, Atty. Gen., Jerry Boone, Sol. Gen., Clement Colucci, Asst. Atty. Gen., Roy P. Moskowitz, Asst. Gen. Counsel to the City University of New York, of counsel), for defendants-appellants.

Joseph Fleming, New York City (Melinda E. Weekes, Debra Ann Galloway, New York City, of counsel), for plaintiff-appellee.

Sheldon D. Camhy, Adrian Zuckerman, Lawrence A. Steckman, Camhy Karlinsky & Stein, New York City, Robert A. Machleder, New York Regional Board of Anti–Defamation League, New York City, for amicus curiae Anti–Defamation League.

Kenneth S. Stern, Samuel Rabinove, Wendy Lecker, Penina Goldstein, New York City, for amicus curiae American Jewish Committee.

Before: VAN GRAAFEILAND and McLAUGHLIN, Circuit Judges, and BURNS, District Judge.*

McLAUGHLIN, Circuit Judge:

In the summer of 1991, Leonard Jeffries was the Black Studies department chairman at City College of New York ("City College"), and he was the keynote speaker at an off-campus symposium on black culture. He spoke predominantly on the bias he perceived in New York State's public school curriculum. During the speech, Jeffries made several derogatory statements, particularly about Jews. The speech ignited a firestorm of controversy, the upshot being the decision by university officials to reduce Jeffries' upcoming term as department chairman from three years to one.

Jeffries sued the university officials in the United States District Court for the Southern District of New York (Kenneth Conboy, *Judge*), alleging that they reduced his term because of the content of his speech, in violation of the First Amendment. After a jury trial, the district court found six of the 14 defendant officials liable for violating Jeffries' rights. The court reinstated Jeffries as department chair, and awarded him $360,000 in punitive damages.

The defendants appeal, arguing that: (1) they did not abridge Jeffries' free speech rights; (2) they are protected from damage awards by the doctrine of qualified immunity; (3) reinstatement was improper; and (4) the punitive damage awards should be vacated as inconsistent with the jury's special verdict findings.

We hold that defendants violated Jeffries' right to free speech, and that the defendants are not shielded by qualified immunity. We also affirm the reinstatement order because it was an appropriate equitable remedy given the nature of the harm suffered. Because we find that the jury's responses were inconsistent with an award of punitive damages, however, we vacate these awards and remand for new trial on punitive damages.

* Honorable Ellen Bree Burns, of the United States District Court for the District of Connecticut,

## BACKGROUND

The facts are largely undisputed.

### A. *The Parties*

Jeffries is a professor at City College, and the chairman of the Black Studies department there. Bernard Harleston is the President of City College, which is part of the City University of New York ("CUNY") system. Ann Reynolds is the Chancellor of CUNY. James Murphy is the Chairman of CUNY's Board of Trustees; Edith Everett is Vice-Chair. The remaining defendants are CUNY Trustees.

Jeffries has chaired the Black Studies department since its creation in 1972. The CUNY by-laws state that a chairman's term lasts three years. Jeffries' sixth consecutive term was due to expire June 30, 1991, and on June 5, the Black Studies professors nominated him to another term as chairman.

At CUNY, faculty nominations for department chairs are subject to the approval of the City College President and the CUNY Board of Trustees. Because Jeffries' term was up at the end of June 1991, the Board should have voted on Jeffries at its June meeting. Due to an administrative error, however, the Board did not act on Jeffries' reappointment at that meeting. Despite the absence of formal Board action, Harleston sent Jeffries a letter on July 1 congratulating him on his reappointment. The letter did not mention that the Board had yet to approve his selection.

### B. *The Speech*

On July 20, Jeffries delivered his now notorious speech in Albany, at the Empire State Black Arts and Culture Festival. Jeffries was introduced to the audience as the chairman of City College's Black Studies department, and as a former member of a committee organized to review the New York public school curriculum's treatment of minorities. The Festival was not affiliated with CUNY in any way.

sitting by designation.

Jeffries spoke for more than an hour, primarily criticizing the racial and ethnic biases he perceived in the public school curriculum. During the speech, Jeffries made several comments about Jews that were hateful and repugnant. For example, Jeffries launched several *ad hominem* invectives at specific state and federal officials who supported the curriculum, calling one an "ultimate, supreme, sophisticated, debonair racist," and a "sophisticated, Texas Jew." Jeffries also told his audience that Jews had a history of oppressing blacks. He said that "rich Jews" had financed the slave trade, and that Jews and Mafia figures in Hollywood had conspired to "put together a system of destruction of black people" by portraying them negatively in films.

### C. *The Aftermath*

Jeffries' speech, which was initially broadcast on an Albany television station, received extensive media attention in the New York City area. On August 8, Harleston released a statement condemning Jeffries for undermining CUNY's policy of striving toward racial, ethnic and religious harmony, and indicating that he would "initiate a thorough review of this situation." Reynolds, Murphy, and Everett issued a press release the same day, saying that CUNY would "examine Professor Jeffries' actions and statements and, if warranted, ... pursue vigorously with City College the remedies that may be appropriate and available...."

Over the next few weeks, Reynolds and Harleston discussed with other CUNY administrators the possibility of removing Jeffries as department chairman. Harleston asked the City College Provost and the Dean of the Social Sciences division to review Jeffries' performance as department chair since July 1 to determine whether the publicity surrounding the speech hampered his ability to run the department.

One week later, the Social Sciences Dean sent Harleston a memorandum concluding that Jeffries had met his "ordinary administrative responsibilities ... during an extraordinary period of time." The Dean also cautioned, however, that his review was perfunctory, and that he would submit a follow-up report.

The Provost subsequently reported to Harleston that he had interviewed several people within and without the Black Studies department; according to the Provost, all of those interviewed stated that Jeffries was carrying out his duties adequately. The Provost told Harleston that Jeffries was scheduling courses, running department meetings, recruiting faculty, keeping records, and representing the department at meetings.

Harleston was not satisfied by these two reports on Jeffries' performance. He decided to recommend to the Board of Trustees that they reappoint Jeffries to only a one-year term—instead of the customary three-year term—as department chairman. Reynolds endorsed this planned recommendation. Neither Harleston nor Reynolds investigated whether the Albany speech would impair Jeffries' interaction with Jewish faculty, stigmatize the department or university, or dissuade benefactors from providing financial support.

### D. *The Board Meetings*

The Board of Trustees met in late October, with Jeffries' reappointment on the agenda. Harleston recommended that the Board limit Jeffries' term to one year. The Vice-Chancellor for Legal Affairs, an attorney, warned the Trustees that they could not sanction Jeffries based on the content of his speech. Despite the Vice-Chancellor's admonition, Trustees Edith Everett, Herman Badillo, Blanche Bernstein, and Harold Jacobs voted to reject Jeffries' nomination outright, candidly explaining that their decision rested on the content of his speech. Nine other Trustees voted for Harleston's recommendation, however, and approved a one-year term for Jeffries, to expire at the end of June, 1992. (Trustee Sylvia Bloom abstained from the vote because she had made statements earlier criticizing Jeffries' views.)

Harleston wrote Jeffries of the Board's vote. In his letter, Harleston said that the speech threatened recruitment, fundraising, and CUNY's relationship with the community.

The Provost and Social Sciences Dean made oral follow-up reports to Harleston on Jeffries' performance. They recounted angry exchanges that Jeffries initiated with faculty and administrators regarding his limited term, as well as a bizarre tantrum that Jeffries threw during an interview with a student reporter from Harvard. In December, Harleston decided to replace Jeffries as chairman.

On March 20, 1992, three days before the next Board of Trustees meeting, Harleston announced to the Black Studies department that he planned to recommend that the Board approve Professor Edmund Gordon, retired chairman of Yale University's African–American studies department, to succeed Jeffries in July. Although CUNY by-laws state that the President should confer with the department faculty when choosing a replacement chairman, Harleston had not done so. The faculty opposed Gordon as a candidate, and chastised Harleston for selecting a department chair without consultation.

At the Board meeting, the Trustees voted unanimously to replace Jeffries with Gordon. The defendants gave conflicting testimony about whether, at this meeting, the Trustees discussed Jeffries' performance.

### E. *The Proceedings Below*

In June 1992, Jeffries sued Harleston, Reynolds, and the 14 Trustees under 42 U.S.C. § 1983, alleging that he was removed from the department chair in violation of his First Amendment right to free speech. Jeffries sought reinstatement and punitive damages.

At trial, Jeffries introduced a CUNY by-law provision outlining the responsibilities of a department chairman. The by-laws state that the chairman is charged with carrying out the policies of the department, faculty, and Board of Trustees. They list the chairman's duties to include department record-keeping, assigning courses to department faculty, representing the department at internal CUNY meetings, presiding over department meetings, helping to draft department budget proposals, and evaluating department professors who are up for tenure review.

Jeffries also introduced a summary of the district court opinion in *Levin v. Harleston,* 770 F.Supp. 895 (S.D.N.Y.1991), *aff'd in part, vacated in part,* 966 F.2d 85 (2d Cir.1992). In *Levin,* another controversial CUNY professor had sued Harleston and other CUNY officials for retaliating against him because of his disparaging off-campus statements about blacks. There, the district court ruled that CUNY had violated the professor's First Amendment rights.

The defendants objected that the *Levin* summary was inadmissible because its probative value was substantially outweighed by its prejudicial effect. Judge Conboy admitted the summary, however, because it was probative of defendants' knowledge and state of mind when they limited Jeffries' term.

For their part, the defendants offered evidence that Jeffries was an ineffective chairman, and that they would have denied him a three-year term even if he had not given the speech.

To focus the jury's attention on the proper issues, Judge Conboy submitted four specific questions for the jury to answer. The jury returned the following responses:

1. Has the plaintiff proven by a preponderance of the evidence that Leonard Jeffries' July 20, 1991 speech in Albany was a substantial or motivating factor in the denial of plaintiff's three-year term as Chairman of the Black Studies Department? "YES."

2. Have the defendants shown by a preponderance of the evidence that Leonard Jeffries would have been denied a full three-year term as Chairman of the Black Studies Department even had Jeffries not made his July 20, 1991 speech? "NO."

3. Have the defendants proven by a preponderance of the evidence that Leonard Jeffries' July 20, 1991 speech hampered the effective and efficient operation of the Black Studies Department, the College, or the University? "NO."

4. If the answer to question #3 was no, have the defendants proven by a preponderance of the evidence that the defendants were motivated in their actions by a

reasonable expectation that the plaintiff's July 20, 1991 speech would cause the disruption of the effective and efficient operation of the Black Studies Department, the College, or the University? "YES."

With this special verdict in hand, Judge Conboy balanced Jeffries' speech interest against the defendants' interest in running CUNY efficiently. He found that the subject of Jeffries' speech—the state public school curriculum—substantially involved a matter of public concern. Judge Conboy then noted that the jury had found that Jeffries' speech did not interfere with CUNY operations. Based on these findings, he concluded that Jeffries' interests were greater, and, accordingly, that the defendants had violated his First Amendment rights.

Judge Conboy then submitted to the jury a second verdict sheet, requiring a specific determination as to each defendant's individual liability. The jury responded that Jeffries had proven by a preponderance of the evidence that six defendants (Harleston, Reynolds, Everett, Badillo, Bloom, and Jacobs) took action against Jeffries because of his speech, and that these defendants would not have limited Jeffries' term had he not given the speech. The jury found that Jeffries had failed to make this showing as to the other defendants, however.[1]

On a third verdict sheet, the jury was asked to determine whether any of the six liable defendants had "acted with malicious intent to violate the plaintiff's rights under the First Amendment ... or with malicious intent to unlawfully injure him, or ... with a callous or reckless disregard of the plaintiff's First Amendment rights." If any defendants were found to have such an intent, the jury was required to decide whether, and how much, to award in punitive damages against the culpable parties.

The jury found that all six defendants were liable for punitive damages, apportioned as follows: Harleston—$30,000, Reynolds—$50,000, and Badillo, Bloom, Everett, and Jacobs—$80,000 each. The district judge reduced Harleston's amount to $15,000, and Reynolds' to $25,000.

Jeffries then petitioned the court for a permanent injunction to reinstate him as chairman. The defendants opposed the injunction, and moved to overturn the jury's verdict on the grounds that the evidence was insufficient and that they were shielded by qualified immunity. The defendants also moved that the court vacate the punitive damage awards as inconsistent with the jury's response to question four in the first special verdict.

In a published opinion, Judge Conboy denied the defendants' motion and ordered Jeffries reinstated as department chairman. See Jeffries v. Harleston, 828 F.Supp. 1066 (S.D.N.Y.1993). He noted that there was substantial evidence that Jeffries' speech motivated the defendants to act, and that defendants had offered little credible evidence that they had limited his term for other legitimate reasons. Judge Conboy also ruled that the defendants were not protected by qualified immunity because, in light of the Levin decision, they should have known that they could not retaliate against an employee for speech on matters of public concern.

In addition, Judge Conboy rejected the defendants' argument that the special verdict findings were inconsistent with the punitive damage awards:

the jury could have reasonably found that while a majority of the defendants had a reasonable expectation that the plaintiff's July 20, 1991 speech would cause hampering of the efficient and effective operation of the University, the six defendants found liable did not have this reasonable expectation.

Finally, finding that the balance of equities weighed in Jeffries' favor, Judge Conboy ordered the defendants to reinstate Jeffries as department chairman for two years.

## DISCUSSION

On appeal, the defendants argue that the district court erred because: (1) the defendants did not violate Jeffries' First Amendment rights; (2) they were shielded from liability by qualified immunity; (3) reinstate-

1. Bernstein died before trial and was not included in this verdict sheet.

ment was improper; and (4) the punitive damage awards were inconsistent with the special verdict findings. We address these arguments in turn.

## I. *The First Amendment*

■ Central to our constitutional democracy is the right to speak on political or social matters without fear of retribution by the government. *See generally Palko v. Connecticut,* 302 U.S. 319, 327, 58 S.Ct. 149, 152–53, 82 L.Ed. 288 (1937) (Cardozo, J.) (freedom of speech is "the indispensable condition of nearly every other form of freedom"). This freedom does not vanish when the views expressed jar majoritarian sensibilities. As Justice Holmes observed 75 years ago:

> [W]e should be eternally vigilant against attempts to check the expression of opinions that we loathe and believe to be fraught with death, unless they so imminently threaten immediate interference with the lawful and pressing purposes of the law that an immediate check is required to save the country.

*Abrams v. United States,* 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting). More recently, Justice Harlan has added: "That the air may at times seem filled with verbal cacophony is, in this sense not a sign of weakness but of strength." *Cohen v. California,* 403 U.S. 15, 25, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284 (1971).

■ This protection against government retaliation for speech extends also to the government's own employees, although the need for an efficiently functioning government must be factored into the balance. *See Rankin v. McPherson,* 483 U.S. 378, 384, 107 S.Ct. 2891, 2896–97, 97 L.Ed.2d 315 (1987). Accordingly, when a public employee expresses an opinion on a matter of social or political concern, even if critical of the very government that employs him, his employer cannot sanction him unless his speech has impaired the efficiency of government operations. *See id.* at 379–80, 383, 107 S.Ct. at 2894–95, 2896 (data entry clerk in sheriff's office may not be fired for expressing to coworkers her hope that next attempt on President Reagan's life succeeds); *Piesco v. City*

*of New York,* 933 F.2d 1149, 1159–60 (2d Cir.1991) (city official cannot be fired for publicly criticizing her own department where there is no evidence that her statements actually hampered the department's functioning), *cert. denied,* —— U.S. ——, 112 S.Ct. 331, 116 L.Ed.2d 272 (1992). *Compare Dambrot v. Central Michigan Univ.,* 839 F.Supp. 477, 487 (E.D.Mich.1993) (university could fire coach for racial remarks to players in locker room during halftime pep talk because the players' poor performance was "not the kind of question that is fairly cast as a 'public' issue").

■ To determine whether the government violated an employee's free speech rights, the employee's interest in speaking on matters of public concern must be balanced against the government's interest in rendering public services efficiently. *Pickering v. Bd. of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). We review *de novo* the district court's balancing of interests. *See Connick v. Myers,* 461 U.S. 138, 150 n. 10, 103 S.Ct. 1684, 1691 n. 10, 75 L.Ed.2d 708 (1983).

■ To establish a *prima facie* case that the government fired an employee in violation of his free speech rights, the employee must demonstrate that the speech: (1) involved a matter of public concern; and (2) was a substantial or motivating factor in the government's decision to fire him. *See Frank v. Relin,* 1 F.3d 1317, 1328–29 (2d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 604, 126 L.Ed.2d 569 (1993). The former is a question of law; the latter, of fact. *Id.,* 1 F.3d at 1329.

■ Jeffries' speech unquestionably involved public issues. The speech criticized the public school curriculum (and its supporters) for reflecting bias against minorities, and discussed the history of black oppression. These issues are suffused with social and political hues. True, the tenor of Jeffries' speech was less than ingratiating, and, as evidenced by the ensuing uproar, its content affronted many who heard it or, at least, heard about it. But First Amendment protection does not hinge on the palatability of the presentation; it extends to all speech on

public matters, no matter how vulgar or misguided. *See Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S.Ct. 1575, 1577, 29 L.Ed.2d 1 (1971) ("[S]o long as the means are peaceful, the communication need not meet standards of acceptability.").

Jeffries also satisfied the second *Pickering* prong. The evidence substantially supported the jury's finding that defendants' decision to remove Jeffries was motivated by the content of the Albany speech. Before the speech, Harleston was eager to send premature congratulations to Jeffries on his reappointment. After the speech, Harleston asked two administrators to determine whether Jeffries was performing his duties as chairman adequately. Even though both reported favorably on Jeffries' performance, Harleston proceeded to recommend that the Board reappoint Jeffries for only a one-year term.

Then, the Board, with no evidence that Jeffries' performance was deficient or that the speech threatened to harm CUNY, voted to limit Jeffries' term. Four Trustees voted against reappointment outright, candidly conceding that they did so because of the content of Jeffries' speech. Likewise, at the next Board meeting, where the Board approved Gordon as the new department chairman, several Trustees admitted at trial that Jeffries' performance was not discussed at all.

The jury, therefore, had ample basis to find that the speech was the impetus for the defendants' action. Thus, Jeffries' speech was a substantial or motivating factor behind the vote to limit his term, and Jeffries has made out a *prima facie* case.

■ Even though the employee makes out a *prima facie* case that the defendants sanctioned him for his speech, the defendants may still escape liability by showing either that: (1) they would have fired the employee regardless of the speech; or (2) the employee's conduct interfered with the "effective and efficient fulfillment of [defendants'] responsibilities to the public." *Frank*, 1 F.3d at 1329 (quoting *Connick*, 461 U.S. at 150, 103 S.Ct. at 1691).

Having carefully reviewed the record, we agree with the district court that the jury could reasonably have concluded that the defendants would not have removed Jeffries but for the speech. It was only after the speech that Harleston began expressing concerns about Jeffries' performance; not three weeks before, he had congratulated Jeffries on his reappointment. While the defendants offered evidence that Jeffries had exchanged heated words with other CUNY personnel regarding CUNY's reaction to his speech and had berated a student reporter from Harvard, there was no evidence that these incidents were ever considered by the Board as a reason to deny reappointment. The record shows that the Trustees did not remove Jeffries for any reason other than his speech.

Nor have the defendants shown that Jeffries' speech interfered with CUNY's operation. *See Frank*, 1 F.3d at 1329. Generally, interference in this context entails impairing employer discipline, causing disharmony among co-workers, disrupting close working relationships where loyalty and confidence are essential, failing to perform one's duties, or frustrating the regular operation of the government enterprise in question. *See Pickering*, 391 U.S. at 570–73, 88 S.Ct. at 1735–37.

How much interference the government must show to justify sanctioning an employee for his speech will vary, depending on the degree that the speech involved matters of public concern. *See Connick*, 461 U.S. at 146–47, 103 S.Ct. at 1689–90. If the speech only tangentially touched on public issues, the government need not wait until "the disruption of the office and the destruction of working relationships is manifest" before taking action. *Id.*, 461 U.S. at 152, 103 S.Ct. at 1692. If, alternatively, the speech substantially addressed public issues, the government must show the statements "actually undermined the effective and efficient operation" of the employee's department. *Piesco*, 933 F.2d at 1159. Because, as we held above, Jeffries' speech substantially concerned public issues, the defendants shoulder the weightier burden of showing that the speech caused substantial disruption at CUNY.

Endeavoring to lighten their burden, the defendants argue that they need only demon-

strate a reasonable expectation that Jeffries' speech would eventually cause disruption because Jeffries held a highly visible, policymaking position. True, the government generally has more discretion to sanction an employee who serves in a "confidential, policymaking, or public contact role" than one who performs ministerial functions. *Rankin,* 483 U.S. at 390–91, 107 S.Ct. at 2900 (the employee's responsibilities determine whether his statement "somehow undermines the mission of the public employer"); *Piesco,* 933 F.2d at 1157 (a high-ranking public official must act with caution when commenting on matters integral to that person's official responsibilities); *Hall v. Ford,* 856 F.2d 255, 261 (D.C.Cir.1988) (government's burden of proving interference is less stringent when the employee holds a position for which loyalty is essential). The defendants, however, have not shown how Jeffries, by virtue of his position as department chair, could undermine CUNY's mission with his speech. *See Rankin,* 483 U.S. at 390, 107 S.Ct. at 2900. The CUNY by-laws charge the department chairman with carrying out the policies of the department, faculty, and Board of Trustees. They do not vest him with the power to make policy. Further, the department chairman performs an essentially ministerial role: He keeps department records, assigns courses to teachers, represents the department at internal CUNY meetings, drafts department budget proposals, leads departmental meetings, and makes departmental tenure evaluations.

In addition, the evidence suggests that, within CUNY, department chairs are perceived as ministerial positions. When Harleston asked the Provost to evaluate Jeffries' performance, the Provost focused solely on whether Jeffries had completed the ministerial tasks listed in the by-laws. He did not examine Jeffries' interpretations of CUNY policy, his contact with the public, or the like. Nor did the defendants introduce any other evidence at trial to show that department chairmen have special duties of loyalty or confidentiality, or that they have more public contact than an ordinary professor. While a department chair may be a position of prestige, it does not call for the level of institutional fidelity that would justify the lesser interference burden.

In short, to rebut Jeffries' *prima facie* case, the defendants must show substantial interference. We find that the defendants have provided meager evidence at best that Jeffries' speech had any real disruptive effect on CUNY operations, and thus, have fallen short of their burden.

■ Finally, the defendants argue that Jeffries failed to show that they caused his deprivation, as required by section 1983. *Monell v. Department of Social Servs.,* 436 U.S. 658, 692, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). The defendants reason that: (1) only four of the 13 voting Trustee defendants were found liable for retaliating against Jeffries because of his speech (Harleston and Reynolds were not Trustees); (2) these four could not have caused Jeffries' deprivation because the other nine Trustees voted to limit Jeffries' term for constitutionally permissible reasons. We disagree.

■ A plaintiff may establish causation under section 1983 if he shows that the defendants participated in, or were "moving forces" behind, the deprivation. *See City of Oklahoma v. Tuttle,* 471 U.S. 808, 819–20, 105 S.Ct. 2427, 1648–49, 85 L.Ed.2d 791 (1985); *Gutierrez–Rodriguez v. Cartagena,* 882 F.2d 553, 560–61 (1st Cir.1989) (causation includes participating in an affirmative act, or "setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.").

Under this standard, all six defendants found liable have "caused" Jeffries' deprivation. Defendants Harleston and Reynolds, while not Trustees, appear, nevertheless, to have been prime movers behind CUNY's effort to take action against Jeffries; Harleston himself was singularly responsible for proposing that the Board of Trustees approve Jeffries for only a one-year term. Thus, they were "moving forces" behind the vote. In addition, by voting at another meeting to replace Jeffries with Gordon, Trustees Badillo, Bloom, Everett and Jacobs participated in the act (voting) that caused Jeffries' deprivation (removal from the department chair).

Accordingly, we affirm the district court's finding that the defendants violated Jeffries' First Amendment rights.

## II. *Qualified Immunity*

The defendants contend that even if they did violate Jeffries' rights, the damage awards should be vacated because the defendants, as government officials, enjoy qualified immunity.

■ The doctrine of qualified immunity balances society's need to allow public officials to discharge their duties without fear of litigation against the individual's interest in being safe from official abuse. *See generally Harlow v. Fitzgerald,* 457 U.S. 800, 813–15, 102 S.Ct. 2727, 2735–36, 73 L.Ed.2d 396 (1982); *Zinker v. Doty,* 907 F.2d 357, 359 (2d Cir.1990), *cert. denied,* 498 U.S. 1041, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991). Thus, qualified immunity shields state actors from liability for their official acts unless they violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. *See White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1063–64 (2d Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 185, 126 L.Ed.2d 144 (1993).

■ A right is "clearly established" if it meets one of three tests: (1) it is defined with reasonable clarity; or (2) the Supreme Court or this Circuit has affirmed its existence; or (3) a reasonable defendant would understand from existing law that his acts were unlawful. *White Plains Towing,* 991 F.2d at 1064. *See generally Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986) (the doctrine does not shield "the plainly incompetent or those who knowingly violate the law").

■ The defendants should have known from existing law that they could not remove Jeffries from the department chair on the basis of his speech. By July 20, 1991, both the Supreme Court and the Second Circuit had held repeatedly that, absent a disruption of government operations, a public employer may not sanction an employee for speaking on issues of social or political concern. *See, e.g., Rankin,* 483 U.S. at 379–80, 383, 107 S.Ct. at 2894–95, 2896 (clerk in sheriff's office wrongfully fired for saying that she hoped next assassination attempt on President Reagan was successful); *Pickering,* 391 U.S. at 574, 88 S.Ct. at 1737 (teacher could not be fired for publicly criticizing school's athletic budget or for questioning character of school administrators); *Piesco,* 933 F.2d at 1159–60 (high-ranking city administrator wrongfully fired for telling a legislative committee that a "moron" could pass the police entrance exam) (decided June 3, 1991); *Dube v. State Univ. of New York,* 900 F.2d 587, 598 (2d Cir.1990) (it is "objectively unreasonable" for university administrators to retaliate against professor solely because of his public speech).

In the face of this overwhelming precedent, the defendants argue that the right was not clearly established because no court had specifically addressed whether a public university might limit a department chairman's term on the basis of his speech. The defendants, in effect, believe they can act as they choose until there is a case on all fours. We reject such jural insouciance. The defendants should have known their actions were illegal from the decisions reproving closely analogous conduct. *See Selzer v. Fleisher,* 629 F.2d 809, 812 (2d Cir.1980) ("A prior judicial decision holding conduct such as appellants' to be a basis for suit was not necessary to apprise them of a rule which should come as no surprise....."), *cert. denied,* 451 U.S. 970, 101 S.Ct. 2046, 68 L.Ed.2d 348 (1981). *See also Vasbinder v. Ambach,* 926 F.2d 1333, 1341 (2d Cir.1991). Indeed, two of those decisions, *Pickering* and *Dube,* specifically involved public school teachers.

This abundance of precedent alone would justify our rejection of defendants' qualified immunity defense. Here, however, the defendants had further notice that their actions were illegal. One month before the first Board meeting, Harleston and other CUNY officials lost a lawsuit in which a professor claimed that CUNY stigmatized him on the basis of statements he made outside the classroom. *See Levin v. Harleston,* 770 F.Supp. 895 (S.D.N.Y.1991), *aff'd in part, vacated in part,* 966 F.2d 85 (2d Cir.1992). The *Levin* district court opinion was a clarion

call to the defendants that sanctioning Jeffries for his speech was unconstitutional.[2]

Finally, we note that the Trustees were advised at the first Board meeting by CUNY's own Vice Chancellor of Legal Affairs that they could not act against Jeffries based on his speech.

For these reasons, we hold that the defendants were not shielded by qualified immunity.

## III. *Reinstatement*

The defendants also argue that the district court should not have ordered them to reinstate Jeffries as department chairman. Essentially, their position is that the injunction would have unduly harsh public consequences because Gordon, the replacement chosen by the Board, is a more effective department chairman.

■ An injunction is proper when the plaintiff has suffered a constitutional violation that causes continuing irreparable injury for which the law provides no adequate remedy. *See New York State Nat'l Org'n for Women v. Terry,* 886 F.2d 1339, 1362 (2d Cir.1989), *cert. denied,* 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990). In determining whether to issue an injunction, the court should balance the relative injuries to the parties and should consider the public consequences. *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982).

We find that reinstatement was well within the district court's discretion. The defendants violated Jeffries' right to free speech by limiting his term as department chairman. And, as the district court noted, the department chair is a position of prestige, both inside and outside CUNY. Unremedied, the violation constitutes a continuing loss of that prestige, further aggravated by the cloak of disgrace that surrounded Jeffries' removal.

Further, he has no remedy at law for this injury. *See Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) ("[I]rreparable injury means injury for which a monetary award cannot be adequate compensation ...").

On balance, we find that Jeffries' injury outweighs any detriment to the public from having Jeffries as department chairman for two more years. We affirm the reinstatement order.

## IV. *Punitive Damages*

■ Punitive damages may be awarded for a constitutional violation where the defendant's conduct was driven "by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983). They are imposed to "punish the person doing the wrongful act and to discourage him and others from similar conduct in the future." *Restatement (Second) on Torts* § 908 cmt. a (1979). Accordingly, punitive damages should be reserved for a case where the defendant acted with a degree of malice akin to the *mens rea* required for most crimes. *See Pacific Mutual Life Ins. Co. v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). *See also* William L. Prosser, *Handbook of the Law of Torts* 9 (4th ed. 1971).

■ The defendants argue that we should vacate the punitive damage awards against Harleston, Reynolds, Everett, Badillo, Bloom and Jacobs because they are inconsistent with an earlier jury finding. Specifically, they note that, in response to question four on the first special verdict form, the jury found that the defendants were motivated in their actions by a "reasonable expectation" that Jeffries' speech would disrupt the effective and efficient operation of CUNY. The defendants regard this finding as inconsis-

---

2. The defendants argue that the district court improperly allowed the jury to see a summary of the district court's opinion in *Levin* because it suggested to the jury that the defendants had a propensity to commit first amendment violations.

While evidence of prior bad acts may not be admitted to show propensity, it may come in for other purposes, such as to show state of mind.

Fed.R.Evid. 404(b). Here, the summary of the *Levin* opinion was highly probative to show that the defendants knew that they were not allowed to punish faculty members for extracurricular expression. The *Levin* summary was relevant on the issues of liability and punitive damages, and thus was properly admitted.

tent with the jury's subsequent finding that six of the defendants acted with malicious intent or reckless indifference. We agree.

The Seventh Amendment's right to trial by jury will not tolerate a judgment based on a material inconsistency in the jury's verdict. *Finnegan v. Fountain*, 915 F.2d 817, 820 (2d Cir.1990). On the other hand, respect for the right to trial by jury counsels that in reviewing a jury's special verdict responses, we prefer a reading that reconciles apparent inconsistencies. *See Brooks v. Brattleboro Mem. Hosp.*, 958 F.2d 525, 529 (2d Cir.1992). Where we cannot harmonize the jury's responses rationally, however, the Seventh Amendment requires that we vacate the judgment and order a new trial. *See id.* at 529–30; *Finnegan*, 915 F.2d at 820; *Auwood v. Harry Brandt Booking Office, Inc.*, 850 F.2d 884, 891 (2d Cir.1988); *Bernardini v. Rederi A/B Saturnus*, 512 F.2d 660, 662 (2d Cir.1975).

In *Finnegan*, for example, the plaintiff sued a police officer under section 1983 for using excessive force when arresting her. The jury was given two special verdict sheets. On the first, it found that the officer acted in the good faith belief that he was using reasonable force; on the second, the jury found he acted maliciously, wantonly, and oppressively. *Finnegan* held that these verdicts flatly contradicted each other, and, accordingly, that the judgment could not stand. *Id.*, 915 F.2d at 821. *See Bates v. Jean*, 745 F.2d 1146, 1152 (7th Cir.1984) (jury finding that officer did not know actions were illegal contradicts finding that his actions were shocking, callous, and brutal).

We believe the jury responses here, like those in *Finnegan*, are hopelessly irreconcilable. The defendants could not have acted with a reasonable expectation that Jeffries' speech would harm CUNY, and also with malice or reckless indifference. If defendants' actions were motivated by a reasonable expectation of harm to CUNY, the court could not award punitive damages; if they acted maliciously or with reckless indifference, such awards would be proper. *See Restatement (Second) on Torts* § 908 cmt. b ("[P]unitive damages may be awarded because of . . . wrongful purpose or intent. . . .

Punitive damages are not awarded for mere inadvertence, mistake, errors of judgment and the like. . . .").

The district court—understandably, given the time and resources it had invested in this prickly litigation—sought to harmonize the jury's responses by interpreting the first response to mean only that "a majority of the defendants" reasonably expected the speech would harm CUNY, and the second response to declare which defendants did *not* act with such a reasonable expectation. We find this interpretation more ingenious than ingenuous. There is no fair way to read the first verdict response so narrowly. There is a threshold of clarity that a jury verdict should cross, particularly when it awards punitive damages based on a finding of malice or recklessness. The legal and moral consequences of such a finding are too serious to leave the finding to conjecture and surmise.

Accordingly, we vacate the punitive damage awards against Harleston, Reynolds, Everett, Badillo, Bloom, and Jacobs, and remand for a new trial to decide whether Jeffries should recover punitive damages from these six defendants.

## CONCLUSION

In sum: We affirm the district court's holding that the defendants violated Jeffries' First Amendment rights; we affirm that defendants were not shielded by qualified immunity; and we affirm the order reinstating Jeffries to his department chair for two years; however, we vacate the award of punitive damages and remand for a new trial solely on that issue.

AFFIRMED in part, VACATED in part, and REMANDED.