George MROSEK, Plaintiff,

v.

Ronald KRAATZ, John Salcius, and Town of Manchester, Defendants.

No. 3:99CV1628 (RNC).

United States District Court, D. Connecticut.

Sept. 30, 2001.

Marc P. Mercier, Beck & Eldergill, Manchester, CT, for plaintiff.

Brian P. Leaming, Halloran & Sage, Hartford, CT, for defendants.

### RULING AND ORDER

CHATIGNY, District Judge.

Plaintiff owns rental properties in Manchester, Connecticut, which were subject to inspections by Defendants for Fire, Health, and Housing Code violations. Plaintiff claims that, after he criticized Defendants publicly, Defendants retaliated against him with unjustified inspections, citations and a criminal summons, and that Defendants singled him out among similarly situated property owners. Plaintiff seeks damages and attorney's fees pursuant to 42 U.S.C. § 1983, § 1988, state-law causes of action for intentional and negligent infliction of emotional distress, and conspiracy. Defendants' motion for summary judgment [23–1] is granted with respect to the federal claims and dismissed without prejudice with respect to the remaining state-law causes of action.

### FACTUAL BACKGROUND

Plaintiff owns and operates rental properties at 37–85 Charter Oak Street ("South Park Apartments") and at 36–42 Maple Street. Originally as part of a revitalization effort in 1994, and continuing through 1997, these properties were repeatedly inspected. Defendant Kraatz, as head of the Town of Manchester's Health Department was responsible for the enforcement of the housing code and was part of the Town's Code Inspection/Enforcement Team. Defendant Salcius, as Town Sanitarian, conducted many of the inspections.

In 1996, tenants of the South Park Apartments filed a complaint with the Town's Fair Rent Commission. (Defendant Kraatz, as Director of Health, is a member of the Fair Rent Commission without a vote.) A hearing was conducted before the Fair Rent Commission on July 22, 1996. Plaintiff criticizes the Town for the way the meeting was conducted and disagrees with a memorialization, prepared by Defendant Kraatz, of the agreement reached during the hearing. According to the Commission's decision, complainants could reduce their rent by $50/month if

Plaintiff did not make certain repairs at South Park Apartments. On August 8, 1996, the *Journal Inquirer* quoted the Plaintiff as saying "This is absurd, we will fight it out in court." On August 12, 1996 Plaintiff filed an appeal against the Fair Rent Commission's decision, which was received by the Health Department on August 13.

Plaintiff claims that, following his public criticism and appeal, he was singled out by the Defendants and that Defendants sought to retaliate against him for the exercise of his First Amendment rights. The retaliation and differential treatment, according to Plaintiff, were expressed in a series of inspections conducted by the Defendants between August 14, 1996 and July 1997, citations for violations, and a criminal summons (which was later dismissed). Plaintiff insists that he complains not of specific instances of harassing conduct, but of a larger scheme in which, for instance, the Town's longstanding policy of informal cooperation with landlords was abandoned for immediate citations in his case. Def.'s Opp'n Mem. at 5. Discovery has been conducted.

## DISCUSSION

### 1. Retaliation for the Exercise of a Constitutional Right

Defendants prevail on their summary judgment motion because they have shown that there exists no issue on which a reasonable jury could find for the Plaintiff. Plaintiff insists that such an issue exists in the Defendant's retaliatory motive and intent towards him. The individual Defendants, however, are entitled to qualified immunity as an affirmative defense to Plaintiff's claim that the Defendants retaliated against him for the exercise of his First Amendment right to criticize public officials.

■ Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Defendants Kraatz and Salcius were government officials performing discretionary duties, and they enjoy qualified immunity because their conduct violated no clearly established constitutional or statutory right and was objectively reasonable.

■ There was no clearly established constitutional right of a rental property owner to be free from a series of building inspections, citations and summons for violations after speaking to the press and filing an appeal. A right is only clearly established if "(1) it is defined with reasonable clarity or (2) the Supreme Court or this Circuit has affirmed its existence; or (3) a reasonable Defendant would understand from existing law that his acts were unlawful." *Jeffries v. Harleston,* 21 F.3d 1238, 1248 (2d Cir.1994), *vacated on other grounds and remanded,* 513 U.S. 996, 115 S.Ct. 502, 130 L.Ed.2d 411 (1994). Plaintiff does not contend that there is such a right, but argues rather that a clearly established constitutional right existed in Plaintiff's right to be free from retaliation for his exercise of Free Speech. Opp'n Mem., at 14–19. This argument fails to appreciate that the essence of a retaliation claim is that otherwise permissible conduct is rendered unlawful by the actor's retaliatory motive or intent. "To recover on a first amendment claim under § 1983, a plaintiff must demonstrate that his conduct is deserving of first amendment protection and that the defendants's conduct was motivated by or caused by his exercise of free

speech." *Rattner v. Netburn*, 930 F.2d 204, 208 (2d Cir.1991) (quoting *Donahue v. Windsor Locks Bd. of Fire Com'rs*, 834 F.2d 54, 58 (2d Cir.1987)); *Cf. Mount Healthy City Sch. Distr. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Plaintiff's retaliation claim therefore turns on Defendants' intent—the subjective element, which the doctrine of qualified immunity seeks to strike from the equation in a summary judgment motion. The problem is that "[t]he 'clearly established law' and 'objective reasonableness' facets of current qualified immunity doctrine tug in opposite directions where ... the 'clearly established law' itself contains a subjective component." *Martin v. Metropolitan Police Dep't*, 812 F.2d 1425, 1432 (D.C.Cir.), *reh'g denied*, 824 F.2d 1240 (D.C.Cir.1987). This means that, "when intent is crucial to a party's claim, ... the court's consideration of intent is relevant to the determination of whether a constitutional violation exists but not in deciding if the constitutional standard was clearly established." *Auriemma v. Rice*, 910 F.2d 1449, 1453 (7th Cir.1990), *cert. denied*, 501 U.S. 1204, 111 S.Ct. 2796, 115 L.Ed.2d 970 (1991). As a result, the courts of this Circuit have examined the alleged specific conduct in retaliation cases in order to determine whether a clearly established constitutional right existed. *See, e.g., X-Men Security, Inc. v. Pataki*, 196 F.3d 56, 68 (2d Cir.1999) ("The conduct attributed by the complaint to the legislators is that they made accusations against [plaintiff], asked government agencies to conduct investigations into its operations, questioned [plaintiff's] eligibility for an award of a contract supported by public funds, and advocated that [plaintiff] not be retained. We are aware of no constitutional right on the part of the plaintiffs to require legislators to refrain from such speech or advocacy."); *McCullough v. Wyandanch Union Free Sch. Dist.*, 187 F.3d 272, 278–280 (2d Cir. 1999) (applying a Pickering balancing test using the specific facts of the case).

▇ There is merit in Plaintiff's assertion, however, insofar as in First Amendment retaliation claims the Defendant's motivation and intent become relevant in a second step. Where a constitutional claim contains a subjective component, the Plaintiff must "provide specific allegations or direct evidence of the required state of mind in order to avoid summary judgment based on the defense of qualified immunity." *Blue v. Koren*, 72 F.3d 1075, 1082–83 (2d Cir.1995); *cf. Siegert v. Gilley*, 500 U.S. 226, 235–36, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) (Kennedy, J., concurring). "The reasonableness of the conduct is itself substantial evidence in support of the motion [for summary judgment] and requires in response a particularized proffer of evidence of unconstitutional motive." *Blue*, 72 F.3d at 1084.

▇ *A.* On examination of the record I find that the individual Defendant's conduct after Plaintiff's public criticism was objectively reasonable.

The first inspection after the Fair Rent Commission hearing was conducted at South Park Apartments on August 12, 1996 (before the Health Department received notice of Plaintiff's appeal, but after the article in the *Journal Inquirer*). Defendant has admitted that he agreed to repair some of the problems addressed by the Fair Rent Commission, notwithstanding the dispute about the memorialization of that meeting's agreement and Plaintiff's subsequent appeal. Pl.'s Dep., Defs.' Exh. B, at 62. Plaintiff also stated that he understood that Health Department officials would check Plaintiff's compliance with his agreement to make repairs. *Id.*, at 84–85. There had already been two inspections at South Park Apartments fol-

lowing the Fair Rent Commission hearing, on July 26 and July 30, 1996, which Plaintiff does not consider unwarranted or unjustified.[1] Pl.Dep., Defs.' Exh. C, at 17. Further, Defendant Salcius had been instructed to follow up on a gutter leak and a missing light at South Park Apartments in a memorandum from Defendant Kraatz. Defs.' Exh. H. The memorandum is dated August 2, 1996, several days before the newspaper article and Plaintiff's appeal.

The second inspection after the Fair Rent Commission hearing and Plaintiff's appeal of its decision occurred at the Maple Street properties on August 14, 1996. The Defendants have offered evidence that the inspection was part of a series of inspections at Maple Street, the most recent of which had been on July 22, 1996. At that date the Defendant Salcius identified code violations. Defs.' Exh. M. A re-inspection of the property on August 14 was therefore objectively reasonable, especially since the Plaintiff has admitted the existence of code violations at the time. Defs.' Exh. C, at 50–51.

A further series of inspections followed at South Park Apartments starting October 21, 1996. The inspection of October 21 was objectively reasonable because Defendant Salcius followed up on a water leakage for which the Plaintiff had been cited on July 31, 1996. Def.'s Exh. Q. There followed a tenant complaint that the water leak had not been corrected, and a number of further inspections that were apparently necessitated because the problem appeared fixed except in heavy rain. Defs.' Supp.Mem., at 23–26. These inspections were objectively reasonable.

Following an inspection for the water leakage problem at South Park Apartments on November 26, 1996, the Plaintiff was informed, in a letter from Defendant Salcius on December 2, 1996, that putty was cracked and missing in certain windows. Defs.' Exh. BB. The letter was followed by a formal Notice of Alleged Violation on December 4, 1996, which threatened prosecution in the case of noncompliance (signed by Defendant Kraatz). Defs.' Exh. CC. Here also, Defendants acted in an objectively reasonable manner: Plaintiff does not dispute that the glazing problem (defective putty) existed, nor that Defendants conducted the inspection as a follow-up to the water leakage, nor that the glazing problem could reasonably be considered a violation of the housing code.[2]

In May 1997, Defendant Salcius submitted an affidavit to the Housing Court because, on reinspection, the glazing had not been fixed. Plaintiff had told Defendant Salcius that he had appealed the citation for the glazing but, finding no record of an appeal at the Health Department, Defendant Salcius nevertheless submitted the affidavit. (Plaintiff had sent his appeal to the town attorney rather than the Health Department.[3]) The criminal prosecution

---

1. In his opposition memorandum of law, Plaintiff claims retaliatory acts by Defendants before August 12, 1996. Opp'n Mem., at 24–26. This contradicts Plaintiff's sworn testimony that the relevant exercise of his Free Speech rights occurred no earlier than August 8, 1996. Pl.'s Resp. to Defs.' Interrog., Nos. 18, 9. I ignore these allegations of earlier retaliatory conduct because a party may not create an issue of fact by contradicting earlier sworn testimony. *Raskin v. Wyatt*, 125 F.3d 55, 63 (2d Cir.1997); *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir.1996);

*Mack v. United States*, 814 F.2d 120, 124 (2d Cir.1987).

2. Plaintiff objects that the glazing violations had not been considered code violations previously. *See infra*, at 13–14.

3. The Manchester Housing Code provides that appeals should be filed with the chairperson of the Housing Code Appeals Board. Defs.'s Exh. EE, § 16.02. Plaintiff had correctly filed his previous appeal, dated August 12, 1996, with the Appeals Board.

was later dismissed. Given that the Plaintiff had been formally cited for the glazing violation and had had six months during which to address the problem, the criminal summons was objectively reasonable.

B. Despite the objective reasonableness of the individual Defendants' conduct, the motion for summary judgment must fail if the Plaintiff adduces "particularized evidence of improper motive [which] may include expressions by the officials involved regarding their state of mind, circumstances suggesting in a substantial fashion that the plaintiff has been singled out, or the highly unusual nature of the actions taken." *Blue*, 72 F.3d 1075, at 1084. The U.S. Supreme Court has made clear that, "[w]hen intent is an element of a constitutional violation ... the primary focus in not any possible animus directed at the plaintiff; rather it is more specific, such as the intent to disadvantage all members of a class that includes the plaintiff or to deter public comment on a specific issue of public importance." *Crawford–El v. Britton*, 523 U.S. 574, 592, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998) (citations omitted). To show such specific intent, Plaintiff makes a number of allegations, which will be addressed in turn.

The first of Plaintiff's allegations is that the series of inspections and citations is "part of a larger scheme of conduct done in retaliation for his exercise of free speech." Pl.'s Opp'n Mem., at 16. Plaintiff has not produced evidence of communications or expressions by the individual Defendants that would hint at such a larger scheme. The mere timing of the inspections does not support the theory that Defendants' intended to deter Plaintiff's public comment. An inspection did take place the day after the Health Department received notice of Plaintiff's appeal. But the Plaintiff has produced no particularized evidence that Defendants were motivated by the appeal, for instance, discussed it, or even that Defendant Salcius (who conducted the inspection on August 14, 1996) was aware of it. On the contrary, Defendants have produced evidence that the inspection was conducted because of a memorandum to follow up, dated before the newspaper article or the appeal. Defs.' Exh. O.

The Plaintiff further alleges that the Defendants abandoned their policy of informal cooperation with landlords in retaliation against him. New written Housing Court Enforcement Procedures were adopted on August 2, 1996—before Plaintiff exercised his free speech rights. The new Enforcement Procedures provided for informal resolution. The first inspection that the Plaintiff claims was retaliatory (August 14, 1996/Maple Street properties) resulted not in a formal citation, but an informal letter from Defendant Salcius. Defendants, under the Enforcement Procedures, could have issued a criminal summons at that time, since there had already been a formal citation, dated November 16, 1995, for the conditions observed (peeling paint). Defs.' Exh. N. They did not. There is also on the record an informal letter by Defendant Salcius, dated October 23, 1996, in which the Plaintiff is notified of a water leak in an electrical panel and was told to repair it (South Park Apartments). Defs.'s Exh. S. Plaintiff thus fails to show that he was subject only to formal proceedings after the alleged change in policy and provides no particularized evidence on which a jury could find an abandonment of informal cooperation with Plaintiff.

Plaintiff further alleges that "the defendant Kraatz departed from his normal practice and procedure and personally conducted inspections of the plaintiff's property." Plaintiff does not explain, however, why an inspection by Defendant Kraatz, rather than Defendant Salcius, would be

an expression of retaliatory intent or how it would represent a particular burden and deter Plaintiff's free speech. Plaintiff cites Defendant Kraatz' deposition in support of his argument. In it, Defendant Kraatz states that he inspected the South Park Apartments at the request of the Fair Rent Commission in order to provide it with "administrative support." Defendant Kraatz was an ex-officio member of the Commission and further stated that the inspections differed from other inspections in that they were not confined to code violations, but included inspection of amenities related to the Commission's fair rent decision. Pl.'s Exh. 2, at 48–49.[4]

With respect to the Inspection of the Maple Street properties, Plaintiff alleges that the Defendants changed their interpretation of the Housing Code and considered conditions at the Maple Street properties code violations where they had not been considered code violations before. Plaintiff had been cited formally on November 16, 1995 (and previously) for the conditions (peeling paint) and was again informally notified of the code violation on August 14, 1996. Defs.' Exh. L, Exh. N. Plaintiff admitted in his deposition that the conditions existed and agreed that they constituted Code violations. Defs.' Exh. C, at 54, L. 6–7 (Plaintiff: "I agree that they're all housing violations that existed as determined by the health department."). Yet in his opposition memorandum, Plaintiff states that "[H]ad those inspections [of July 22 and August 8] found violations of housing code, the defendants could have and would have immediately referred the plaintiff for criminal prosecution pursuant to the November 16, 1995 Notice of Al-

leged Violation. Indeed, had the defendants' identified housing code violations on July 22, 1996 or August 8, 1996, there would have been no need for the August 14, 1996 inspection to determine the condition of the Maple Street properties." Pl. Opp'n Mem., at 26. This allegation is insufficient to create a triable issue of fact.

The Plaintiff contends that his citation for defective glazing at South Park Apartments is an expression of the defendants' retaliatory intent. He alleges that such glazing problems had not been considered code violations previously, that they had existed during earlier inspections and had not been objected to, and that he was given no chance to cooperate informally with the authorities. He also points to statements by Leo Beval, the Chief Building Inspector, and Robert McKinney, the Code Enforcement Agent, that the defective glazing did not constitute a code violation.[5] Pl.'s Exh. 10, Exh. 11. Hanna Marcus, The Director of Human Services, who was present at inspections at South Park Apartments on November 20, 1996, did consider the glazing a code violation. In a memorandum to Richard Sator, the Town's General Managers, she stated: "Few code violations were observed on that day, except ... some south facing windows where the glazing is in a state of disrepair. The owner has made some repairs, however, upon close review, some windows still require fixing." Defs.' Exh Y., at 2. Plaintiff's claim is therefore that retaliatory motive is to be inferred from fact that different interpretations of the Housing Code existed, and that the one less favorable to him was chosen. This

---

4. Plaintiff has cited other passages from Defendant Kraatz' deposition in support of this allegation (pp. 20, 21, and 43) but has failed to make them available to the Court.

5. Mr. Beval stated in a memorandum that "there were some windows that needed reputtying, but again, not causing weathering problems.... The present Housing Code is not very clear on the window puttying...." Pl.'s Exh. 10., at 1, 2.

showing is not sufficiently particularized evidence to justify a jury trial, for two reasons: First, Plaintiff claims that these acts are in retaliation for an appeal and the description of a Fair Rent Commission proceeding as "absurd" that occurred more than four months previously. Second, the defendants can point to evidence showing that they acted for other, non-retaliatory reasons. "[P]roof of an improper motive is not sufficient to establish a constitutional violation—there must also be evidence of causation." *Crawford–El v. Britton*, 523 U.S. 574, 593, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998); *Locurto v. Safir, et al.*, 264 F.3d 154, 169 (2d Cir.2001). Defendants have shown that there were tenant complaints (Defs.' Exh. U, V), which led the Town's General Manager, on November 14, 1996, to direct Hanna Marcus, the Director of Health Services, to address the situation at South Park Apartments:

> "I have authorized the Code Enforcement Team to redirect their efforts to inspect and thoroughly examine the complaints put forth by the South Park Tenant Association, as well as an inspection of any units for [sic] which the occupants are willing to make available.... I would ask that you monitor the performance of the Code Enforcement Team, as well as the preparation of the reports requested to ensure a timely response. I would also ask that you identify any deficiencies in the process which may be impeding the ability to carry out corrective action, such as gaps within the Housing Code...." Defs.' Exh. W.

The chronology of events is therefore as follows: Tenants complain on October 29 and again November 9,[6] the General Man-

ager directs that South Park Apartments be reinspected on November 14, inspections follow on November 19, 20, and 26 (a water leakage was observed only after heavy rain on November 26), and on December 2 an informal letter is written to Plaintiff, followed by a formal citation on December 4, 1996. In his opposition memorandum, Plaintiff himself explains that "[t]he Health Department was under extreme pressure both from within the Town of Manchester and without from the tenants to resolve the plaintiff's situation at South Park." Pl.'s Opp'n Mem., at 24. Given this record, there is no evidence to show that it was not the defendants' desire to "resolve the situation at South Park," but rather their malicious intent to retaliate for a four-month-old newspaper article and appeal, that led to the citation of the glazing violation.

Plaintiff's final allegation of retaliatory motive is the following: On May 7, 1997, six months after the citation for glazing violations, Defendant Salcius swore out an affidavit for criminal charges against Plaintiff, because the defective putty had not been fixed. *See supra*, p. 9. In his deposition, Plaintiff has stated:

> And [Defendant John Salcius] came to the garage later that afternoon [of May 7, 1996]. And John is basically a nice person. It's unfortunate that he did what he did, but what he did at that point was to say, "On the glazing, you're having trouble. Are you having trouble doing the glazing because the tenants wouldn't unlock their storm windows?" Which we had had that problem with Irene Scalora previously.
>
> And I said he's trying to give me an out on this. And I said, "No, no, we're not

---

6. There had apparently been earlier tenant complaints about the glazing. *See* Pl.'s Dep.,

Defs.'s Exh. C, at 80, L. 5–9.

going to do it. We filed an appeal." Pl.'s Dep., Defs.'s Exh. C, at 62.

Plaintiff's allegation that Defendant Salcius initiated criminal proceedings against the Plaintiff to retaliate for the exercise of First Amendment rights is incompatible with Plaintiff's view that Defendant Salcius was "trying to give [the Plaintiff] an out on this." [7]

In sum, Plaintiff has failed to adduce particularized evidence of improper motive that could have tainted the individual Defendants' objectively reasonable conduct.

■ *C.* Plaintiff has also brought the retaliation claim against the individual defendants in their official capacities as Director of Health and Town Sanitarian, as well as the Town of Manchester. For purposes of § 1983, a suit against individuals in their official capacity is tantamount to a suit against the municipality. *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). The Town of Manchester is liable for (compensatory) damages only if the violation of Plaintiff's rights resulted from the implementation or execution of a policy statement, ordinance, regulation, or decision officially adopted and promulgated by its decision makers. *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The municipality must have been the moving force behind the alleged injury. *Board of the County Com'rs of Bryan County, OK v. Brown,* 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). Plaintiff has not alleged that such a policy of retaliation against him existed in Manchester. Municipal liability under § 1983 may also be based on a single decision by a municipal official with final policymaking authority.

*Pembaur v. Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). From the record it is apparent that the Defendants were not policy-making officials in this sense. They reported to the Town's General Manager, who directed inspections of South Park Apartments in November 1996. Defendant Kraatz therefore did not have final policymaking authority with respect to the enforcement of Housing Code. Nor did Defendant Salcius, who reported to Defendant Kraatz. The Plaintiff has not alleged that there was another person who was a policymaker in Manchester and who decided on retaliation again him.

## 2. *Violation of Equal Protection Rights*

Defendants are also entitled to summary judgment on Plaintiff's claim under §§ 1983, 1988 for violation of the Constitution's equal protection clause. As far as Plaintiff contends that the inspections and citations he received after August 8, 1996 were in violation of his equal protection rights, the Defendants are entitled to qualified immunity on the ground discussed above.

Plaintiff further contends that, in receiving a criminal summons for the glazing violations at South Park Apartments, he was singled out because the summons represented a departure from the established procedure (there had never been a criminal summons for glazing violations before) and "an exceptional and unique lowering of the standard for criminal referrals to include conditions which do not involve life threatening risks to tenants." Pl.Opp'n Mem., at 28. This selective prosecution claim also fails.

---

7. In his opposition memorandum, Plaintiff asserts that in the May 7, 1996 affidavit "defendants' unique and retaliatory treatment of the plaintiff reached its zenith." Opp'n Mem., at 28.

The Supreme Court has made clear that "[b]ecause such claims invade a special province of the Executive—its prosecutorial discretion—we have emphasized that the standard for proving them is particularly demanding, requiring a criminal defendant to introduce 'clear evidence' displacing the presumption that a prosecutor has acted lawfully." *Reno v. American–Arab Anti–Discrimination Comm.*, 525 U.S. 471, 494, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999); *accord United States v. Armstrong*, 517 U.S. 456, 463–465, 116 S.Ct. 1480, 134 L.Ed.2d 687, (1996). Plaintiff admits that there have been several criminal summons for housing code violation in Manchester before. Neither the fact that Plaintiff has received the first summons for glazing violations in Manchester, nor the fact that other summons may have been for lead paint or hazardous conditions represent clear evidence of the Defendants' malicious intent to single the Plaintiff out. The sense of urgency that forces a municipality to resort to the criminal law may not only derive from the danger of the condition, but also from frustration at a slow and tedious resolution of the problem.

### 3. State Law Claims

Plaintiff also raises the state law claims of intentional infliction of emotional distress, negligent infliction of emotional distress, and civil conspiracy. After granting Defendants' summary judgment motion for the federal law claims, the Court lacks jurisdiction over the state law claims. They are therefore dismissed without prejudice.

### CONCLUSION

For the foregoing reasons, it is hereby ordered that the defendant's motion for summary judgment is granted with respect to Plaintiffs §§ 1983, 1988 claims, and the complaint is dismissed with prejudice. With respect to the state-law causes of action, the complaint is dismissed without prejudice. The Clerk may close the file.