**Thomas PAPPAS, Plaintiff–Appellant,**

v.

**Rudolph GIULIANI, Mayor of the City of New York and Howard Safir, Commissioner of the Police Department of the City of New York, Defendants–Appellees.**

Docket No. 00–9487.

United States Court of Appeals,
Second Circuit.

Argued: Nov. 16, 2001.

Decided May 13, 2002.

144

Christopher T. Dunn, Amicus Curiae New York Civil Liberties Union, New York, NY, (Arthur Eisenberg on the brief), for Plaintiff–Appellant.

Rosemary Carroll, Carroll & Friess, New York, NY, on the brief for Plaintiff–Appellant.

Margaret King, for Michael D. Hess, Corporation Counsel of the City of New York, New York, NY, (Edward F.X. Hart, Bryan D. Glass, Marta Ross, of counsel), for Defendants–Appellees.

Before LEVAL, SOTOMAYOR, Circuit Judges, and McMAHON, District Judge.*

LEVAL, Circuit Judge.

This appeal raises the question whether a municipal police department may, without violating the First Amendment's guarantee of freedom of speech, terminate a police officer by reason of the officer's anonymous dissemination of bigoted racist anti-black and anti-semitic materials. Appellant Thomas Pappas brought this suit under 42 U.S.C. § 1983 against officials of the City of New York and the New York City Police Department (N.Y.PD) alleging that he was unconstitutionally fired from his employment by the police department by reason of his exercising rights of free speech protected by the First Amendment. The United States District Court for the Southern District of New York (Buchwald, J.) granted the defendants' motion for summary judgment. We affirm the district court.

*Background*

Pappas was employed by the New York City Police Department (N.Y.PD) from January 25, 1982 until his termination on August 18, 1999. At the time of his termination, Pappas worked in the Department's Management Information Systems Division (MISD), which was responsible for maintenance of its computer systems.

On at least two occasions in 1996 and 1997, Pappas received letters from the Mineola Auxiliary Police Department (MAPD) soliciting charitable contributions and enclosing reply envelopes for use in sending contributions. Pappas stuffed the

---

* The Honorable Colleen McMahon, United States District Court for the Southern District of New York, sitting by designation.

reply envelopes with offensive racially bigoted materials and returned them anonymously. The materials included printed fliers conveying anti-black and anti-semitic messages. The fliers asserted white supremacy, ridiculed black people and their culture, warned against the "Negro wolf ... destroying American civilization with rape, robbery, and murder," and declaimed against "how the Jews control the TV networks and why they should be in the hands of the American public and not the Jews."

Upon receipt of these materials, the Nassau County Police Department then undertook an investigation in the hope of identifying the sender. It sent out a charitable solicitation mailing with coded return envelopes. Once again, a response envelope was returned, stuffed with similar racist materials. The Nassau County Police Department traced the source to P.O. Box 321 in Mineola, New York—a post office box registered under the name "Thomas Pappas/The Populist Party for the Town of North Hempstead." The Nassau County Police Department made another mailing in 1997, with the same result.

Upon ascertaining that Thomas Pappas was a New York City police officer, the Nassau County Police Department notified the New York City Police Department's Internal Affairs Bureau (IAB), which repeated the investigative experiment, sending Pappas further charitable solicitation mailings, once again with the result that Pappas returned the reply envelopes stuffed with similarly provocative materials.

On March 24, 1998, Pappas was interrogated by a New York City police officer. Pappas at first admitted sending such materials to his friends, and, after some evasion, admitted sending the materials in response to the MAPD and other solicitations.

The NYPD charged Pappas with violation of a Departmental regulation. A disciplinary trial was held before Josefina Martinez, Assistant Deputy Commissioner of Trials. Pappas asserted at the trial that he had sent the materials because, "I was protesting, and I was tired of being shaken down for money by these so-called charitable organizations. And it was a form of protest, just put stuff back in an envelope and send stuff back as a form of protest." The NYPD and Pappas stipulated that Pappas's conduct and the subsequent investigation had been the subject of news media reports in the *New York Times,* Fox 5 news, ABC News on Channel 7, and a Long Island television station.

Commissioner Martinez issued a 20–page decision, finding Pappas guilty of violating a Departmental Regulation by disseminating defamatory materials through the mails, and recommending his dismissal from the force. Police Commissioner Howard Safir adopted the recommendation and dismissed Pappas.

Pappas then filed this action seeking monetary and injunctive relief, claiming that his termination violated his First Amendment rights. The district court granted the defendant's motion for summary judgment and dismissed the action.[1] This appeal follows.

### Discussion

Where a government employee suing for violation of the First Amendment establishes that he was terminated by reason of

---

1. The district court decided that the NYPD's administrative proceedings did not bar Pappas's subsequent § 1983 suit under collateral estoppel, but went on to conclude that Pappas could not make out a First Amendment violation. Because we agree with the district court on the First Amendment issue, we do not discuss the questions of preclusion.

his speech "upon a matter of public concern," the Supreme Court has instructed that the court's task is "to arrive at a balance between the interests of the ... citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). *See also Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Under the balancing test, the governmental employer may defeat the claim by demonstrating that it "reasonably believed that the speech would potentially interfere with or disrupt the government's activities, and can persuade the court that the potential disruptiveness was sufficient to outweigh the First Amendment value of that speech." *Heil v. Santoro*, 147 F.3d 103, 109 (2d Cir.1998) (internal citations omitted).

■ There is no dispute that Pappas was terminated because of his speech and would not have been terminated were it not for his speech. The defendants contend that Pappas's anonymous sending of the bigoted materials may not be "fairly characterized as constituting speech on a matter of public concern." *Connick*, 461 U.S. at 146, 103 S.Ct. 1684. The First Amendment concerns itself less with speech relating to an individual's private concerns than with speech relating to matters of public concern; accordingly a public employee has greater latitude to discipline an employee over speech expressing private concerns. "When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Id.* at 146, 103 S.Ct. 1684.

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48, 103 S.Ct. 1684. Because of our resolution of the *Pickering* balancing test, we assume without deciding that Pappas's mailings constituted speech on a matter of public concern.

■ *Pickering*'s balancing test weighs the plaintiff's interest in freely speaking his mind on a matter of public concern against the State's interest in the performance of its functions. *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731. Under our Constitutional doctrines, few values are more carefully and thoroughly protected than the citizen's right to speak his mind on matters of public concern without interference by government. Nonetheless, the right is not absolute. At times, the right of free speech conflicts with other important governmental values, posing the problem which interest should prevail. The effective functioning of entities of government could be seriously undermined by its employees' unrestrained declarations of their views. For this reason, the employee's right of free speech is sometimes subordinated to the interest of the effective functioning of the governmental employer.

The effectiveness of a city's police department depends importantly on the respect and trust of the community and on the perception in the community that it enforces the law fairly, even-handedly, and without bias. *See* Tom R. Tyler, *Why People Obey the Law* 22–23, 67 (1990) (demonstrating how belief in the legitimacy of legal authority and trust in law enforcement leads to greater compliance with law). If the police department treats a segment of the population of any race, religion, gender, national origin, or sexual preference, etc., with contempt, so that the particular minority comes to regard

the police as oppressor rather than protector, respect for law enforcement is eroded and the ability of the police to do its work in that community is impaired. Members of the minority will be less likely to report crimes, to offer testimony as witnesses, and to rely on the police for their protection. When the police make arrests in that community, its members are likely to assume that the arrests are a product of bias, rather than well-founded, protective law enforcement. And the department's ability to recruit and train personnel from that community will be damaged. *See* David Cole, *No Equal Justice* 169–178 (1999) (describing the costs that the perception of inequality and disparate treatment places on law enforcement; it engenders distrust and unwillingness to cooperate and encourages crime), Brandon Garrett, Note, *Standing While Black: Distinguishing Lyons in Racial Profiling Cases*, 100 Colum. L.Rev. 1815, 1833 nn. 72–3 (2000) (describing social science evidence that a public perception of police bias undermines community cooperation with law enforcement and compliance with law), C.J. Chivers, *Alienation is a Partner for Black Officers*, N.Y. Times, April 3, 2001, at A1; Kevin Flynn, *Feeling Scorn on the Beat and Pressure From Above*, N.Y. Times, Dec. 26, 2000, at A1 (describing how negative public perceptions of police in New York, especially by minority communities, has led to low morale, and difficulty in recruitment and retention, especially among minorities).

For a New York City police officer to disseminate leaflets that trumpet bigoted messages expressing hostility to Jews, ridiculing African Americans and attributing to them a criminal disposition to rape, robbery, and murder, tends to promote the view among New York's citizenry that those are the opinions of New York's police officers. The capacity of such statements to damage the effectiveness of the police department in the community is immense. Such statements also have a great capacity to cause harm within the ranks of the Police Department by promoting resentment, distrust and racial strife between fellow officers. In these circumstances, an individual police officer's right to express his personal opinions must yield to the public good. The restrictions of the First Amendment do not require the New York City Police Department to continue the employment of an officer whose dissemination of such racist messages so risks to harm the Department's performance of its mission. In the words of Justice Holmes, "A policeman may have a constitutional right to [speak his mind], but he has no constitutional right to be a policeman." *McAuliffe v. Mayor of New Bedford*, 155 Mass. 216, 220, 29 N.E. 517, 517 (1892) (quoted in *Connick*, 461 U.S. at 143–44, 103 S.Ct. 1684).

Pappas argues that the foregoing considerations should not apply to him because he tried to conceal his identity as the source of the bigoted opinions. He contends he is being punished for his opinions, rather than his actions. The argument misses the mark. Pappas was tried and found to have violated Police Department regulations. That fact is important to our upholding of the lawfulness of the Department's actions. If Pappas had written his bigoted views in a private diary, or revealed them in confidence to his family or intimate friends, and they had become known accidentally, or through a breach of confidence, that case would present different considerations. We do not speculate how such a case would be decided. But those are not the facts we deal with. Here, Pappas deliberately sought to publicize his views. He repeatedly sent leaflets that aggressively pronounced his provocative views to organizations engaged in public solicitation. He admittedly did so with

the intention of influencing public opinion. The Department appropriately took action against him not because of his private opinions but because of his conduct in violation of Departmental regulations—conduct that risked to harm the Department in the performance of its governmental mission. Although Pappas tried to conceal his identity as speaker, he took the risk that the effort would fail.

We turn now to the arguments Judge Sotomayor advances in her dissenting opinion.

* * *

Judge Sotomayor attaches great importance to the fact that Pappas did not occupy a "high level 'supervisory,' 'confidential,' or 'policymaking' role" in the Police Department. She relies on the Supreme Court's statement in *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) that where "an employee serves no confidential, policymaking, or public contact role, the danger to the agency's successful functioning from that employee's private speech is minimal." *Id.* at 390–91, 107 S.Ct. 2891, as well as our observation in *McEvoy v. Spencer*, 124 F.3d 92, 103 (2d Cir.1997) that "the more the employee's job requires confidentiality, policymaking, or public contact, the greater the state's interest in firing her for expression that offends her employer." (internal quotation marks omitted).

While it is undoubtedly the case that ill-considered public statements of a high policy-making executive often have a higher likelihood of harming the employer's accomplishment of its mission than similar statements made by a file clerk, laborer or a janitorial employee, it by no means follows that rank and file employees are incapable of harming the employer's effectiveness by their speech, or that governmental employers are powerless to sanc-

tion lower level employees when their statements do have the capacity to harm the employer's performance of its mission. Neither *Rankin* nor *McEvoy* implied any such thing.

In *Rankin*, a clerical employee in the Harris County, Texas, Constable's office, who had no contact with the public, was fired because, upon learning of the assassination attempt on President Reagan, she and a coworker discussed privately their mutual dislike of the President's welfare cutbacks, and she added, "If they go after him again, I hope they get him." *Id.* at 380, 107 S.Ct. 2891. The lower court found that the statement was not a criminal threat, but rather a hyperbolically framed statement of a political opinion concerning the President's policies. "Although [the plaintiff's] job title was deputy constable, this was the case only because all employees of the Constable's office, regardless of job function, were deputy constables. She was not a commissioned peace officer, did not wear a uniform, was not authorized to make arrests or permitted to carry a gun." *Id.* at 380, 107 S.Ct. 2891 (internal citations omitted). She was a typist and had no contact with the public. There was "no indication that she would ever ... have any involvement with ... the minimal law enforcement activity engaged in by the Constable's office." *Id.* at 392, 107 S.Ct. 2891.

The Court identified as "pertinent considerations [in assessing the employer's legitimate interest in disciplining an employee for speech] whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Id.* at 388, 107 S.Ct. 2891. "These consider-

ations, and indeed the very nature of the [*Pickering* ] balancing test, make apparent that the state interest element of the test focuses on the effective functioning of the public employer's enterprise." *Id.*

The Court easily concluded, considering all the circumstances, that the plaintiff's hyperbolic private utterance of her political opinions did not threaten any of the employer's legitimate interests, and in particular did not "interfere[ ] with the efficient functioning of the [Constable's] office." *Id.* at 389, 88 S.Ct. 1731.

This case is significantly different in several respects: (i) Pappas is a police officer, while the *Rankin* plaintiff was a civilian clerical employee; (ii) Pappas disseminated his diatribes publicly while the *Rankin* plaintiff was overheard speaking privately to a coworker; (iii) Pappas was venting his personal racial bias, while the *Rankin* plaintiff (albeit in foolishly hyperbolic terms) was discussing the governmental policies of the President, *see Connick,* 461 U.S. at 150, 103 S.Ct. 1684 ("the State's burden in justifying a particular discharge varies depending upon the nature of the employee's expression."); (iv) furthermore, and most important, upon consideration of all the pertinent facts, while the *Rankin* plaintiff's statement had little or no capacity to harm the effective functioning of the employer, the making of Pappas's statements by a police officer has a very high capacity to impair the effective functioning of the Police Department in the discharge of its public mission and to provoke anger and discord among fellow police officers.

Had the facts of this case conformed to *Rankin*'s in any of these respects, we might well reach the same conclusion as the *Rankin* Court. But *Rankin* certainly did not mean that only high level, policymaking employees may be removed by reason of their speech. To be sure, the Supreme Court observed that "[t]he bur-

den of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails." *Rankin,* 483 U.S. at 390, 107 S.Ct. 2891. By no means does it follow that an ordinary police officer is immune from disciplinary discharge for public statements that carry a high potential to impair the police department's performance of its mission.

■ The main consideration in assessing the employer's interest is the capacity of the employee's public speech to harm the effective functioning of the employer's enterprise. The public perception in minority communities that risks to harm the mission of the Police Department is not that the Police Commissioner or his principal deputies are racially biased. It is rather the perception that ordinary cops are biased. An ordinary police officer's distribution of these bigoted hate-filled materials reinforces that perception and thus harms the effectiveness of the Police Department. Furthermore, for police officers of one race to express hatred and scorn for members of another race obviously fans anger, dissension and racial tensions among officers of different races and thus inflicts harm of a second kind on the Department's performance of its mission.

Judge Sotomayor's second argument is that, because Pappas was assigned to computer work in the Management Systems Information Division rather than to law enforcement contact with the public, his statements had no capacity to impair the Department's effectiveness. If Pappas were not a police officer but rather a civilian employee hired to work on the Department's computers, his case would have greater similarity to *Rankin,* and the capacity of his racist remarks to impair the Department's performance of its mission would be diminished. But Pappas is not a civilian employee. He is a cop. The fact

that he was assigned to work on computers does not make him any less a cop, either in fact or in public perception. His assignment furthermore was subject to change; at any time he could have been assigned to a beat. If the press became aware of his dissemination of racist diatribes, it would report that this was done by a police officer—not that it was done by a person employed to work on Police Department computers. Furthermore, as to the capacity of Pappas's statements to cause racial tension and strife *among fellow police officers*, it would make no difference whether he was assigned to patrol a beat or to program computers.

Judge Sotomayor's third point is that Pappas's statements were made from his home, on his own time, and anonymously, in a manner that did not reveal that he was a police officer. Judge Sotomayor cites the Supreme Court's observation in *Connick* that "[e]mployee speech which transpires entirely on the employee's own time, and in non-work areas of the office, [brings] different factors into the *Pickering* calculus, and might lead to a different conclusion." 461 U.S. at 153 n. 13, 103 S.Ct. 1684. That observation in *Connick* was made with reference to an employee's complaint about office policies and procedures. It is undoubtedly true that complaints about office policies made away from the office to persons having no connection with the employment would generally have little capacity to harm the employer. It is also true that Pappas's proclamations of bigotry made privately, away from work, during off-duty time, had a lesser likelihood of undermining the Department's effectiveness than if he had passed out his leaflets in uniform to citizens in the streets of New York or to his fellow officers at the workplace.

■ But to say that his statements would have had greater likelihood of causing harm if made in uniform or at work does not mean that they did not have a substantial capacity to cause harm as they were made. Where and when the statements are made is certainly a factor to be considered in the overall assessment, but it is only a factor. No talismanic or determinative significance attaches to it. What we must do in such cases is assess the entire picture—especially the likelihood that the employee's speech will harm the functioning of the governmental employer. Given the nature of Pappas's statements and their very high capacity to inflict serious harm on the employer's mission if it were discovered that they came from a police officer, the fact that Pappas acted anonymously, at home, and on his own time does not alter the ultimate conclusion that the Department was entitled to dismiss him because of the harm to the Department that his statements risked to inflict.

Judge Sotomayor's final point is that the Department should not be permitted to discharge Pappas because, absent the Department's decision to bring disciplinary charges, no one would have known that these offensive materials were being distributed by a police officer. Judge Sotomayor argues in essence that, upon learning that Pappas was violating its rules by disseminating bigoted racist materials, the Department should have swept the matter under the rug hoping no one would ever learn the facts; and if it chose instead to bring charges against Pappas, it has only itself to blame for the resulting harm to its reputation, and may not discharge Pappas for his misconduct. In our view this argument is seriously misguided as a policy matter, and is premised furthermore on a misunderstanding of the law.

First, as to the policy implications, we have little sympathy for the suggestion that the proper course for the Police Department, upon learning that one of its

officers was disseminating offensive racially bigoted materials, was to hush the matter up and hope to keep it secret. Had the Department taken this course and the truth had eventually become known, the harm to the Department would have been all the greater because the Department would be perceived as tolerating Pappas's acts and being in passive complicity. While it may be true that the Department could have avoided adverse publicity had it covered up Pappas's misconduct rather than proceeding against him, that does not make it the right thing to do, and the Department did not lose the right, as Judge Sotomayor suggests, to dismiss Pappas for this misconduct merely because the bringing of the disciplinary action brought to public light the fact that it was a police officer who was responsible for the hate mailings.

Judge Sotomayor's argument is also premised on a misunderstanding of the government's burden under *Pickering*. A governmental employer's right to discharge an employee by reason of his speech in matters of public importance does not depend on the employer's having suffered *actual* harm resulting from the speech. The employee's speech must be of such nature that the government employer reasonably believes that it is likely to interfere with the performance of the employer's mission. *See Waters v. Churchill*, 511 U.S. 661, 673–74, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (the government need only "make a substantial showing that the speech is ... likely to be disruptive"); *Connick*, 461 U.S. at 152, 103 S.Ct. 1684 ("[W]e do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action."); *Heil*, 147 F.3d at109 ("the government can prevail if it can show that it reasonably believed that

the speech would potentially interfere with or disrupt the government's activities"); *Jeffries v. Harleston*, 52 F.3d 9, 12–13 (2d Cir.1995) (rejecting any actual harm requirement, and stating that the proper inquiry is into "potential disruptiveness"). The employer's interest in discharging the employee is demonstrated if the employee's statements create a significant risk of harm, regardless whether that harm actually materializes.

In conclusion, it is indeed possible to imagine changed facts that would make the case against Pappas still stronger. The Department's right to dismiss him would have been even clearer if he were a high ranking policy-maker, or if he had distributed his leaflets to the public while on duty wearing his police uniform. The fact that a stronger case can be imagined does not mean that the actual case for discharge is inadequate. Considering the facts as they are, balancing Pappas's interest in his right to pronounce his views against the interest of the Department as an employer in promoting the efficiency of the public service it performs, *see Pickering*, 391 U.S. at 568, 88 S.Ct. 1731; *Connick*, 461 U.S. at 142, 103 S.Ct. 1684, we conclude that the Department was entitled to terminate Pappas by reason of his public dissemination of his diatribes.

The Department's reasonable perception of serious likely impairment of its performance of its mission outweighed Pappas's interest in free speech. The district court properly held the Department's action did not violate Pappas's rights under the First Amendment.

*Conclusion*

The judgment of the district court is affirmed.

McMAHON, *District Judge,* concurring:

I agree with Judge Leval's thoughtful explanation of why the City's decision to fire Appellant did not run afoul of the *Pickering* doctrine. I write separately, however, because I do not think we need to reach *Pickering.* I agree with the district court that Appellant was engaged in purely private speech.

Whether an employee's speech addresses a matter of public concern must be determined by the "content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers,* 461 U.S. 138, 147–48, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). To fall within the realm of "public concern," an employee's speech must satisfy two criteria. It must relate to a matter of political, social or other concern to the community. And the employee must speak "as a citizen upon matters of public concern," not simply "as an employee upon matters only of personal interest." *Id.* at 147, 103 S.Ct. 1684. Context as well as content matters.

The vile speech for which Appellant was disciplined touched on matters of paramount political and social concern in this country. *See, e.g., Connick,* 461 U.S. at 148 n. 8, 103 S.Ct. 1684 (noting that the right to protest racial discrimination is of public concern); *Jeffries v. Harleston,* 21 F.3d 1238, 1242 (2d Cir.), *vacated on other grounds,* 513 U.S. 996, 115 S.Ct. 502, 130 L.Ed.2d 411 (1994) (finding that professor's anti-semitic speech at a festival was public speech). From that proposition, the other members of the panel conclude that it qualifies as public concern speech. But that is not the law. "[S]peaking up on a topic that may be deemed one of public importance does not automatically mean the employee's statements address a matter of public concern as that term is employed in *Connick.*" *Kokkinis v. Ivkovich,* 185 F.3d 840, 844 (7th Cir.1999). For example, courts in this Circuit and elsewhere have held that complaints of race or gender discrimination—an issue of overwhelming social importance—are not "public concern" speech if they relate only to a personal employment grievance. *Saulpaugh v. Monroe Cmty. Hosp.,* 4 F.3d 134, 143 (2d Cir.1993) (finding that employee's complaints of sex discrimination did not implicate matters of public concern because they "were motivated by and dealt with her individual employment situation"); *Walker v. New York City Transit Auth.,* No. 99 CIV. 2227(DC), 2001 WL 1098022, at *12 (S.D.N.Y. Sept.19, 2001) (rejecting the argument that all complaints relating to race or gender discrimination implicate matters of public concern); *Nonnenmann v. City of New York,* 174 F.Supp.2d 121, 135–36 (S.D.N.Y.2001) (finding that police officer's testimony on behalf of a female, black co-worker in discrimination case was not a matter of public concern); *de Silva v. New York City Transit Auth.,* No. CV 96–2758(RJD), 1999 WL 1288683, at *17 (E.D.N.Y. Nov. 17, 1999) (citations omitted) ("an EEOC complaint based on race and sex discrimination is not a matter of public concern, and therefore, is not protected speech under the First Amendment"). *See also Morgan v. Ford,* 6 F.3d 750, 754–55 (11th Cir.1993) (holding that female employee's complaints of sex harassment were designed to improve her own working conditions, rather than to raise issues of public concern).

*Connick* itself made the point that not all speech on matters of public significance is "public concern" speech. 461 U.S. at 147–48, 103 S.Ct. 1684. The assistant district attorney who was dismissed in that case circulated a survey containing questions about the functioning of the District Attorney's Office that addressed issues of undoubted public importance. Nonetheless, the Supreme Court concluded that

the assistant's speech, viewed in its context (she was gathering ammunition for a new round of controversy with her supervisors), did not touch on matters of public concern, but only the employee's personal interest. The *Connick* court looked behind pretextual "public concern" rationale proffered by the disciplined employee in order to discern whether her conduct, *taken as a whole*, was actually meant to address matters of public concern, or was simply a vehicle for furthering her private interests. *Id.*

So, here, must we. As this Court recently recognized, "the court should focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." *Lewis v. Cowen*, 165 F.3d 154, 163–64 (2d Cir.1999) (citing *Curtis v. Oklahoma City Pub. Sch. Bd. of Educ.*, 147 F.3d 1200, 1212 (10th Cir.1998)). The procedure endorsed in *Lewis* is the procedure that Judge Buchwald followed below—reaching, in my opinion, a correct result—and is the procedure we should follow on this appeal.

Nothing in *Locurto v. Safir*, 264 F.3d 154 (2d Cir.2001), suggests that *Lewis* is no longer good law, or that the context prong of the *Connick* analysis drops out when the speech concerns race relations. In *Locurto*, the police officer and fire fighters were fired for appearing in blackface at a Labor Day parade, on a float that, however tasteless, commented on the effect of integration on the future racial composition of the neighborhood (a phenomenon known as "tipping")—an issue that has been the subject of litigation in this Court.[1] The civic context of the officers' speech on this hot-button topic made its public concern nature so obvious that no one seriously contested it, and this Court proceeded accordingly. *Locurto,*

264 F.3d at 166. Because the "public concern" issue was not litigated in *Locurto*, that case does not help us resolve this one, where the issue is being litigated, and on radically different facts.

The proposition that Pappas engaged in hateful and inflammatory speech to advance a purely private interest can hardly be disputed. Pappas sent several hundred mailings containing this poisonous material anonymously to not-for-profit organizations of all sorts, including a police benevolent society (an error that led to his downfall). The only sin these organizations committed was to ask Pappas for money, and he sent them racist and anti-semitic literature to express his pique at receiving unsolicited mail. While Appellant initially suggested that his mailings were simply a "hobby" with no purpose, *Pappas v. Giuliani*, 118 F.Supp.2d 433, 445 (S.D.N.Y. 2000) (citing Tr. of March 24, 1998 interview at 16), he admitted at his disciplinary hearing that the mailings were a form of "protest" against "being shaken down for money by the so-called charitable organizations." *Id.* (citing Trial Tr. at 108–10). Pappas explained that he hoped the mailings would stop the organizations from soliciting him. *Id.* That is a matter of personal interest if ever there was one.

Pappas argues that his membership in certain White Supremacist organizations transforms speech furthering his private interests into public concern speech. But as the district court correctly noted, Pappas' choice of forum is relevant to any assessment of such a claim. *Connick,* 461 U.S. at 148, 103 S.Ct. 1684; *Kurtz v. Vickrey,* 855 F.2d 723, 729 (11th Cir.1988) ("profession of public concern loses force when it is considered that he took no affirmative steps . . . to inform the public at large about the problems with which he

---

1. *United States v. Starrett City Assoc.*, 840 F.2d

1096 (2d Cir.1988).

was so gravely concerned"); *Terrell v. Univ. of Texas Sys. Police,* 792 F.2d 1360, 1362–63 (5th Cir.1986) (emphasizing the pertinence of failure to make any effort to communicate contents of notebooks to the public in determining whether notebooks contained protected speech). While it is true that speech need not be made in a public forum to qualify as "public concern" speech, *Givhan v. Western Line Consol. Sch. Dist.,* 439 U.S. 410, 414–15, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), *Givhan* does not make either the non-public nature of speech or the identity of the audience to which it is directed irrelevant to a private interest/public concern analysis. If it did, all speech by public employees touching on controversial issues, regardless of context, would automatically be speech of "public concern." As we acknowledged in *Lewis,* that is not the case.

Here, Pappas made no effort to forward his "protests" to parties who might profit from knowing about the public's dissatisfaction over unsolicited direct mail fundraising (such as the Better Business Bureau, charitable oversight agencies, IRS, the media, or the public at large). *Pappas,* 118 F.Supp.2d at 445. This belies his effort to cloak his private interest in the garb of "public concern" speech.

The record admits of but one interpretation: Pappas engaged in vile and offensive activity with the sole goal of getting his name excised from direct mail solicitation lists. He so stated when it mattered most—at his disciplinary hearing—and we should take him at his word. His own mouth condemneth him. Because removing his name from mailing lists is a purely personal concern, Pappas was engaged in purely personal speech, even though the words he spoke touched on matters of public importance. I would thus affirm for the reasons stated by the district court in Part B(1) of its opinion.

SOTOMAYOR, *Circuit Judge,* dissenting:

Today the Court enters uncharted territory in our First Amendment jurisprudence. The Court holds that the government does not violate the First Amendment when it fires a police department employee for racially inflammatory speech—where the speech consists of mailings in which the employee did not identify himself, let alone connect himself to the police department; where the speech occurred away from the office and on the employee's own time; where the employee's position involved no policymaking authority or public contact; where there is virtually no evidence of workplace disruption resulting directly from the speech; and where it ultimately required the investigatory resources of two police departments to bring the speech to the attention of the community. Precedent requires us to consider these factors as we apply the *Pickering* balancing test, and each counsels against granting summary judgment in favor of the police department employer. To be sure, I find the speech in this case patently offensive, hateful, and insulting. The Court should not, however, gloss over three decades of jurisprudence and the centrality of First Amendment freedoms in our lives because it is confronted with speech it does not like and because a government employer fears a potential public response that it alone precipitated.

## I. Public Concern

As a threshold matter, the majority is correct to assume that the materials at issue in this case constitute speech on a matter of public concern. Issues of race relations are "inherently of public concern." *Connick v. Myers,* 461 U.S. 138,

148 n. 8, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *see also Perry v. McGinnis,* 209 F.3d 597, 608 (6th Cir.2000) ("In *Connick* ... the Supreme Court clearly established that racial discrimination is inherently a matter of public concern."). And while we are more comfortable when the speech we are protecting involves protestations against racial discrimination, it is not our role to approve or disapprove of the viewpoint advanced.

In *Jeffries v. Harleston,* 21 F.3d 1238, 1242 (2d Cir.), *vacated on other grounds,* 513 U.S. 996, 115 S.Ct. 502, 130 L.Ed.2d 411 (1994), we were confronted with racial remarks that were "hateful," "repugnant," and clearly inflammatory. The public employee in *Jeffries* had asserted, among other things, that " 'rich Jews' had financed the slave trade" and that Jews had conspired with Mafia figures in Hollywood for the " 'destruction of black people.' " *Id.* at 1242. We found that the comments "unquestionably involved public issues" and were entitled to First Amendment protection. *Id.* at 1245. Pappas's statements in this case about "how the Jews control the

TV networks and why they should be in the hands of the American public and not the Jews" are similarly public in nature. As we recognized in *Jeffries,* "First Amendment protection does not hinge on the palatability of the presentation; it extends to all speech on public matters, no matter how vulgar or misguided." 21 F.3d at 1245–46.[1] While the forum in which Pappas expressed his views was less public than in *Jeffries*—which involved a speech at a festival—that fact does not deprive Pappas's speech of constitutional protection. The Supreme Court addressed this precise issue in *Givhan v. Western Line Consolidated School District,* squarely rejecting the notion "that a public employee forfeits his protection against governmental abridgment of freedom of speech if he decides to express his views privately rather than publicly." 439 U.S. 410, 414, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). None of the cases cited by Judge McMahon's concurrence are to the contrary, as they involved employees speaking about issues concerning their *own employment.*[2] This

---

1. More recently, this Court strongly implied that racial speech, even more purely inflammatory than the speech in *Jeffries* or the instant case, is of "public concern." In *Locurto v. Safir,* 264 F.3d 154 (2d Cir.2001), members of the New York City Police Department and Fire Department were fired after participating in the presentation of a racist, deeply offensive float at a Labor Day parade in Broad Channel, Queens. The float, entitled "Black to the Future," ridiculed African Americans while referring to the future effects of racial integration in their community. The offensive aspects included the participants' wearing blackface, eating watermelon, and worse. *See id.* at 159. This Court proceeded with its analysis on the assumption that the speech was of public concern, noting that the defendant employers "do not strenuously dispute" that the activity "constituted First Amendment speech on a matter of public concern." *Id.* at 166.

2. Moreover, Judge McMahon's reliance on *Kurtz v. Vickrey,* 855 F.2d 723 (11th Cir.1988),

for the proposition that public concern value is diminished where an employee "took no affirmative steps ... to inform the public at large about[ ] the problems with which he was so gravely concerned" is misplaced. Judge McMahon neglects to mention that the *Kurtz* court strongly cautioned against placing dispositive weight on this factor because "such a focus overlooks the Court's holding in *Givhan* ... that a public employee's freedom of speech is not sacrificed merely because the employee 'arranges to communicate privately with his employer rather than to spread his views before the public.' " *Id.* at 727 (quoting *Givhan,* 439 U.S. at 415–16, 99 S.Ct. 693). Furthermore, the *Kurtz* court found this factor important only with respect to matters that were distinctly employment-related, such as the handling of salary issues at the university where the plaintiff was employed. *See id.* at 728–29. With respect to matters of more public interest, such as the closing of a branch of the university, the court found that the speech was of public concern and there-

case involves the categorically different scenario of an employee speaking on issues of race relations entirely unrelated to his job.

## II. *Pickering* Balancing Test

Proceeding to the *Pickering* balancing test, the majority finds that the NYPD's interest in fulfilling its mission outweighs Pappas's First Amendment rights under the circumstances of this case. I disagree. I of course do not dispute the majority's premise that a public employee's free speech interest is often subordinated to the effective functioning of a government employer. I also agree that it is appropriate to consider the agency's mission in relation to the nature of the speech, and I appreciate the enormous importance of race relations to the operation of the NYPD. These facts alone, however, do not support the constitutionality of the NYPD's termination of Pappas. The well-established caselaw of the Supreme Court and this Court requires a more searching inquiry.

A court must consider not only the agency's mission in relation to the nature of the speech, but also the employee's responsibilities in relation to that mission. We are not free to disregard this part of the analysis. The Supreme Court has instructed that "in weighing the State's interest in discharging an employee based on any claim that the content of a statement made by the employee somehow undermines the mission of the public employer, some attention *must be paid* to the responsibilities of the employee within the agency." *Rankin v. McPherson*, 483 U.S. 378, 390, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (emphasis added); *see also McEvoy v. Spencer*, 124 F.3d 92, 102–03 (2d Cir.1997) (empha-

sizing this aspect of *Rankin* ). As this Court has explained, "the more the employee's job requires confidentiality, policymaking, or public contact, the greater the state's interest in firing her for expression that offends her employer." *McEvoy*, 124 F.3d at 103 (quotation marks omitted) (citing *Caruso v. DeLuca*, 81 F.3d 666, 670 n. 3 (7th Cir.1996); *Hall v. Ford*, 856 F.2d 255, 261–64 (D.C.Cir.1988)). The importance of these factors, we have explained, "should not be surprising." *Id.* "Common sense tells us that the expressive activities of a highly placed supervisory, confidential, policymaking, or advisory employee will be more disruptive to the operation of the workplace than similar activity by a low level employee with little authority or discretion." *Id.* (citing *Bates v. Hunt*, 3 F.3d 374, 378 (11th Cir.1993); *Kinsey v. Salado Indep. Sch. Dist.*, 950 F.2d 988, 994 (5th Cir.1992)).

We apply this factor in the law enforcement context by asking whether Pappas held some high-level, "supervisory," "confidential," or "policymaking" role within the police department. If, for example, the Police Commissioner or one of his deputies engaged in racist speech, the mission of the NYPD could be seriously undermined and the city's interest in dismissing him would be compelling. We must also ask whether Pappas's role with the NYPD involved "public contact." A police officer walking the beat, while not exercising broad policymaking authority, is often the representative with whom the public interacts. It is not difficult to see how such an officer who expresses racist views in certain situations could damage the efficient operation of the NYPD. This goes to the heart of the majority's reasoning. The majority explains that, in a city like New

fore protected—notwithstanding the private context of the communication. *See id.* at

729–30.

York, it is the perceived bias among the police department's rank and file that causes the most problems. *Ante,* at 149. The truth of this assertion is undeniable, but varies greatly depending on which police employees are involved. This is why the Supreme Court and this Court scrutinize the individual employee's responsibilities with such care. In *Rankin,* the Supreme Court applied this analysis to the law enforcement context and found that "where ... an employee serves no confidential, policymaking, or public contact role, the danger to the agency's successful functioning from that employee's private speech is minimal." *Rankin,* 483 U.S. at 390–91, 107 S.Ct. 2891. Examples mentioned by the Court of police employees whose speech would likely implicate this "minimal" governmental interest included "computer operator, electrician, [and] file clerk." *Id.* at 391, 107 S.Ct. 2891. Turning to the instant case, it is clear that Pappas's position with the NYPD involved neither the policymaking authority of an executive official nor the public contact of a street cop. He was an internal "computer operator" working for the Management Information Systems Division. *Pappas v. Giuliani,* 118 F.Supp.2d 433, 435 (S.D.N.Y. 2000). While this fact is "not conclusive," our precedents deem it a "very significant" weight on the scales in Pappas's favor as we conduct the *Pickering* balancing test. *McEvoy,* 124 F.3d at 103.

The majority further explains that for a police officer to disseminate racist materials tends to promote the view that New York police officers are racists. According to the Court, "[t]he capacity of such statements to damage the effectiveness of the police department in the community is immense." *Ante,* at 147. Here again, the majority's observation has an element of undeniable truth but requires refinement. At some level of abstraction or aggregation, the potential for racist statements to

damage the NYPD may indeed be "immense." But that is not how the fact-specific *Pickering* test is applied. The question is how potentially damaging is *this* speech—that is, these leaflets sent by this employee under these particular circumstances. We have stated unambiguously that, in conducting the balancing test, "a court must consider whether *the statement* sought to be protected 'impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships ... or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.'" *Lewis v. Cowen,* 165 F.3d 154, 162 (2d Cir.1999) (quoting *Rankin,* 483 U.S. at 388, 107 S.Ct. 2891, and citing *Connick,* 461 U.S. at 151–52, 103 S.Ct. 1684) (emphasis added). To conduct this analysis, we look at the "'manner, time, and place' in which the speech occurs." *Id.* (citing *Connick,* 461 U.S. at 152, 103 S.Ct. 1684). In this case, Pappas engaged in the speech anonymously, on his own time, and through mailings sent from his home. I address these factors in turn.

It is significant that Pappas did not purport to speak for the NYPD. We recently explained that the central reason why "[public employees'] free speech claims are subject to the *Pickering* balancing test" is "the state's significant interest in regulating the expressive conduct of its employees while they are acting on behalf of the state." *Knight v. Conn. Dep't of Pub. Health,* 275 F.3d 156, 167 (2d Cir.2001). This fact alone does not deprive the government of its legitimate interest in the matter, but its interest is higher with respect to "employees who purport to speak for the government." *Moore v. City of Wynnewood,* 57 F.3d 924, 933 (10th Cir. 1995). The significance of this factor depends upon the presence of another factor, already discussed, regarding the responsi-

bilities of the employee. For example, the fact that the Police Commissioner did not purport to represent the NYPD when making a racist statement would mean little. Where, as here, the employee has no such authority or public contact, this aspect is significant. Moreover, the facts of this case are particularly compelling in this regard: Not only did Pappas fail to connect himself to the NYPD, his mailings were entirely *anonymous*, making it considerably less likely that the effect of the speech on the NYPD's operations would be "immense."

It is also significant that the speech occurred away from the office on the employee's own time. In *Connick*, the speech at issue was a workplace questionnaire that "touched upon matters of public concern in only a most limited sense" and would be "most accurately characterized as an employee grievance concerning internal office policy." *Connick*, 461 U.S. at 154, 103 S.Ct. 1684. Finding the First Amendment concerns virtually non-existent and the countervailing interests compelling, the Supreme Court ruled in the government's favor. *Id.* Notwithstanding the relatively minimal free speech interests at stake, the Court nonetheless cautioned that "[e]mployee speech which transpires entirely on the employee's own time, and in non-work areas of the office, bring different factors into the *Pickering* calculus, and might lead to a different conclusion." *Id.* at 153 n. 13, 103 S.Ct. 1684. We adopted this dictum in *Lewis*. 165 F.3d at 162 (stating that "the *Pickering* balance is more likely to favor the government when an employee directly confronts his supervisor with objectionable language than when an employee engages in equivalent speech on his own time and not in front of co-workers") (citing *Connick*, 461 U.S. at 152–53 & n. 13, 103 S.Ct. 1684). The fact that speech takes place in private and away from the workplace favors the employee on both sides of the balancing test: First, it reduces the likelihood of disruption. *See Lewis*, 165 F.3d at 162. Second, it enhances the free speech interests at stake because the employee is speaking in his capacity "as the member of the general public he seeks to be." *Pickering v. Board of Educ.*, 391 U.S. 563, 574, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). In the instant case, Pappas's speech was as far removed from the workplace as possible. He acted as a private citizen, off-duty, anonymously sending mailings from his own home on matters of public concern unrelated to his job as a computer operator for the NYPD. Moreover, the speech in this case implicates matters of public concern far more than did the employee questionnaire in *Connick*, *see supra* Part I, tipping the scales further in Pappas's favor. *See Lewis*, 165 F.3d at 162 ("The more the employee's speech touches on matters of significant public concern, the greater the level of disruption to the government that must be shown.") (citations omitted).

The majority nonetheless maintains that Pappas "deliberately sought to publicize his views," and that "[a]lthough Pappas tried to conceal his identity as speaker, he took the risk that the effort would fail." *Ante*, at 148. Ultimately, the governmental interest that the majority seeks to protect in this case is publicity. The majority's core concern seems to be that, even though Pappas was a low-level employee with no public contact who was speaking privately and anonymously, the possibility remained that the news would get "out into the world" that the NYPD was employing a racist. I agree this is a significant issue, and I do not take it lightly. This Court has made clear that negative publicity affecting the community's faith in government can be a significant factor in the *Pickering* balancing test. *See Lewis*, 165 F.3d at 164–65. And as the majority

points out, news of Pappas's speech did in fact reach the local media. This issue, however, requires closer scrutiny.

This case differs from others we have confronted in a critical respect. In the typical public employee speech case where negative publicity is at issue, the government has *reacted* to speech—which others have publicized—in an effort to diffuse some potential disruption. In this case, whatever disruption occurred was the result of the police department's decision to publicize the results of its investigation, which revealed the source of the anonymous mailings. It was, apparently, the NYPD itself that disclosed this information to the media and the public. Thus it is not empty rhetoric when Pappas argues that he was terminated because of his opinions. *Ante*, at 147–48. The majority's decision allows a government employer to launch an investigation, ferret out an employee's views anonymously expressed away from the workplace and unrelated to the employee's job, bring the speech to the attention of the media and the community, hold a public disciplinary hearing, and then terminate the employee because, at that point, the government "reasonably believed that the speech would potentially ... disrupt the government's activities." *Heil v. Santoro*, 147 F.3d 103, 109 (2d Cir.1998). This is a perversion of our "reasonable belief" standard, and does not give due respect to the First Amendment interests at stake.

### CONCLUSION

I recognize that the *Pickering* test affords substantial deference to government employers, particularly in the law enforcement context. The NYPD's concerns about race relations in the community are especially poignant. But there are limits. "At some point, such concerns are so re-moved from the effective functioning of the public employer that they cannot prevail over the free speech rights of the public employee." *Rankin*, 483 U.S. at 391, 107 S.Ct. 2891. The question is on what side of the line does this case fall. By finding that there is no issue of material fact for trial, the majority lays down too broad a rule regarding the government's ability to disqualify an individual from public employment based on the expression of an unpopular viewpoint. While I agree with the majority that no one factor in the *Pickering* test deserves "talismanic or determinative significance," a full application of this multi-factor test to the unique circumstances of this case indicates that summary judgment was inappropriate. I respectfully dissent.