UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2009

(Argued: December 8, 2009

Decided: September 17, 2010
Errata filed: October 7, 2010)

Docket No. 09-1862-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

AMIR FAGHRI,

   *Plaintiff-Appellee,*

v.

UNIVERSITY OF CONNECTICUT, PHILIP AUSTIN, and PETER NICHOLLS,

   *Defendant-Appellants*.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Before: LEVAL and HALL, *Circuit Judges*, and MURTHA, *District Judge*.[*]

   Defendants Philip Austin and Peter Nicholls, the President and Provost of the University

of Connecticut respectively, appeal from the interlocutory order of the U.S. District Court for the

---

[*] The Honorable J. Garvan Murtha of the U.S. District Court for the District of Vermont, sitting by designation.

District of Connecticut (Bryant, *J.*) denying their motion for summary judgment on the basis of qualified immunity on Plaintiff's claims that Defendants unconstitutionally retaliated against him for his exercise of his right to free speech in violation of the First Amendment and violated his right to due process under the Fourteenth Amendment when they removed him from his position as dean. The Court of Appeals (Leval, *J.*) concludes that Defendants are entitled to qualified immunity as a matter of law. The judgment of the district court is REVERSED, and the case remanded to the district court with instructions to enter judgment for the Defendants.

> STEPHEN J. FITZGERALD, Garrison, Levin-Epstein, Chimes, Richardson & Fitzgerald, PC, New Haven, Connecticut, (Joseph D. Garrison, *on the brief*), *for Appellee.*
>
> MARGARET Q. CHAPPLE, Assistant Attorney General, Office of the Attorney General, Hartford, Connecticut (Nancy A. Brouillet, Assistant Attorney General, *on the brief*), *on behalf of* Richard Blumenthal, Attorney General, *for Appellants.*

LEVAL, *Circuit Judge*:

Defendants, Philip Austin and Peter Nicholls, the President and Provost of the University of Connecticut respectively, appeal from the interlocutory ruling of the U.S. District Court for the District of Connecticut (Bryant, *J.*) denying their motion for summary judgment. Plaintiff, Amir Faghri, alleges that Defendants removed him from his position as dean of the School of Engineering in retaliation for his exercise of his right to free speech in violation of the First

2

Amendment and without according him the procedural rights guaranteed by the Due Process Clause of the Fourteenth Amendment. Defendants moved for summary judgment on the basis of qualified immunity, contending that, without regard to any dispute as to facts, their actions did not violate any clearly established constitutional right of Plaintiff. We agree and accordingly reverse the judgment of the district court.

## BACKGROUND

In May of 1998, the University of Connecticut appointed Amir Faghri to a term of five years as dean of the School of Engineering. His letter of appointment stated that he was "a management employee," and "serve[d] at the pleasure of the Chancellor." (The position of Chancellor has since been replaced by the position of Provost). The letter noted that, as dean, Faghri would have a "leadership role" and must "blend that administrative function with the mandates of the strategic plan."

Five years later, the university appointed Faghri to a second term as dean. This time, his reappointment letter, dated May 21, 2003, did not include a "serve at the pleasure of" clause. Faghri claims that when he and the provost negotiated over his reappointment as dean, he insisted that the letter not contain such a clause. In September of 2004, Provost Fred Maryanski appointed Faghri also to a chaired professorship.

During his second term as dean, Faghri was an outspoken critic of many university policies. His complaint highlights his criticism of six such policies. First, in February 2005,

after serving as a member of a university delegation to Dubai to explore the possibility of establishing a regional campus there, he began speaking out against the proposed campus in emails and at university meetings. In those communications, he argued that the Dubai government was manipulating the university and that the project was "inappropriate."

Second, beginning in October 2005, in university meetings and an email sent to the other deans, he opposed a university plan to close the School of Allied Health, the School of Family Studies, and the College of Continuing Education. Nicholls, who was then the university provost, claims that in one such meeting Faghri verbally attacked him, saying, "I don't know how any of us can trust you again." Faghri made similar complaints in his email to the deans, in which he accused those supporting the plan of being "either dishonest or blinded by their own self interests."

Third, during deans' meetings in 2005 and 2006 he called for an investigation into the university's alleged mismanagement of construction funds related to an initiative entitled "UConn 2000." He expressed these concerns in at least four meetings.

Fourth, in 2006, he sent a letter to a state senator, opposing funding, which the university supported, for the Connecticut Center for Advanced Technology ("CCAT"), an independent entity established to research fuel cell technology. Faghri's letter stated that "the leadership of the School of Engineering believes the Bill [funding CCAT] is fatally flawed for a number of reasons" including that CCAT "lacks the experience, personnel, facilities or the credibility" to perform the funded activities. Austin also heard that Faghri made similar comments to the chief-

of-staff of a local congressman, which Nicholls believed would jeopardize future funding opportunities for the university.

Fifth, beginning in December 2005, in emails, meetings, and conversations, Faghri criticized the university's handling of a federal audit, which resulted in a fine based on the billing practices at the School of Engineering. He argued that the university had not defended itself properly and should not pay the agreed-upon fine. He also defended the role of the School of Engineering, claiming that it was being "singled out" for blame.

Finally, beginning in 2004 Faghri complained, in university meetings and emails to various administrators and faculty members, about inadequate university support for faculty researchers. He complained that this lack of support was causing the university to lose top researchers to other institutions. He also warned about declining morale among the engineering faculty.

Defendants Nicholls and Austin claim that during this period they began receiving complaints about Faghri. Austin explained that he was "constantly having to mediate disputes between [Faghri] and different people" and that "the cost of and frustration and irritation" of interacting with Faghri deterred interdisciplinary programs. Austin also stated that Faghri's attitude was causing faculty to leave, or consider leaving, the university.

In the fall of 2005, Faghri initiated plans to merge two departments within the School of Engineering. On February 6, 2006, Austin and Nicholls met with Professors Harris Marcus and Ross MacKinnon to hear their concerns about the merger. In this and other meetings Austin and

5

Nicholls learned that members of the faculty were dissatisfied with Faghri's leadership. On April 28, 2006, a petition was circulated noting the decline in the School of Engineering's national ranking between 2001 and 2006 and asking the university administration to "restore us to a path of success." Marcus and Professor Doug Cooper presented the petition to Nicholls and told Nicholls that their objective was to remove Faghri. When Nicholls pointed out to them that the petition did not call for Faghri's removal, the professors said they would circulate a second petition with clearer language. They drafted a second petition and circulated it among those professors they believed would be supportive. This petition stated simply, "With this memo based on a wide range of issues, we cast a Vote of No Confidence in Amir Faghri to continue as Dean of the School of Engineering and request his immediate replacement." Thirty-three signatures appeared on the petition. The faculty of the School of Engineering included over 120 people. Marcus also delivered to Austin and Nicholls sixteen letters, ten from former faculty, expressing criticism of Faghri. Most of the faculty did not learn about the petition until May 31, 2006. Twenty-five faculty members later sent letters to Austin and Nicholls expressing concern about the petition and supporting Faghri.

On June 1, 2006, Nicholls called Faghri to a meeting and asked him to resign. Nicholls told Faghri about the two petitions, and advised him that much of the faculty was no longer supportive of his continued leadership. According to Nicholls, Faghri "launched into a tirade" regarding many of the university policies he had complained about previously. Faghri asked Nicholls to show him the complaints, but Nicholls refused.

Faghri refused to resign and was removed the next day. In a letter to the faculty and staff, Nicholls explained, "Dr. Faghri's management has created an untenable climate within the School of Engineering and among his campus peers." Faghri retained his chaired professorship.

Faghri filed suit against the university, Austin, and Nicholls. He asserted claims under 42 U.S.C. § 1983 alleging retaliation for his exercise of his First Amendment right to free speech and deprivation of property without due process of law as required by the Fourteenth Amendment. He also asserted a claim under Conn. Gen. Stat. § 31-51q, which imposes liability on an employer for certain violations of constitutional rights. Austin and Nicholls moved for summary judgment, arguing that Faghri's speech was not protected by the First Amendment and that he did not have a property interest in his deanship protected by the Fourteenth Amendment. They also argued that they were protected by qualified immunity.

The district court denied their motion. *Faghri v. Univ. of Conn.*, 608 F. Supp. 2d 269 (D. Conn. 2009). It determined that summary judgment was inappropriate on Faghri's free speech claim because of issues of material fact as to whether adequate justification existed to demote Faghri and whether any protected speech caused his demotion. The court denied summary judgment on the due process claim because of questions of fact as to whether Faghri had a protected property interest in his deanship. Finally, it refused summary judgment on the basis of qualified immunity noting that "[h]is rights to make the protected statements and to retain his property interest are clearly established because the law governing them has existed for decades." *Id.* at 277.

Defendants brought this interlocutory appeal solely on the question of qualified immunity.

**DISCUSSION**

Defendants contend they were entitled, as a matter of law without regard to any disputed issue of fact, to summary judgment on the basis of qualified immunity. Assuming, as Faghri contends, that he was demoted from his position as dean for voicing opposition to university policies, Defendants contend that the university's interest in efficient administration provided adequate justification for removing him from an executive and policymaking position. They also assert that they are entitled to qualified immunity on Faghri's due process claim because under no clearly established law did he have a property interest in the deanship or an entitlement to receive more predeprivation process than he received.

An appellate court reviews de novo a district court's decision to deny summary judgment on the basis of qualified immunity. *See Moore v. Andreno*, 505 F.3d 203, 208 (2d Cir. 2007). Under qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A violated right is "clearly established" if "it would be clear to a reasonable officer [in the position of the defendant] that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). "This

8

inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Pearson v. Callahan*, 129 S.Ct. 808, 822 (2009) (internal quotation marks omitted). Where a district court denies a defendant's motion for summary judgment based on qualified immunity, the defendant may bring an interlocutory appeal. *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).

Even accepting as true Faghri's contentions as to all disputed issues of fact, we conclude that Defendants did not violate any clearly established constitutional right. Defendants were entitled to summary judgment on the basis of qualified immunity.

**I.     Faghri's free speech claim**

Because the deanship of the School of Engineering is an executive, policymaking position, the management of the university was entitled to have such a position occupied by one who voiced support for, or at least did not voice opposition to, the university's policies. It was therefore entitled to remove Faghri from that position for publicly opposing the university policies. To be sure, the First Amendment protects Faghri's right to speak in opposition to university policies. He could not have been jailed or held liable for such speech or enjoined from speaking. But the management of a public institution, such as a university, is not required to retain in a management or policymaking position a person who publicly opposes its policies. Such an institution is entitled, for the sake of effective implementation of its policies, to have in management positions, especially high-ranking executive positions, persons who will support its policies, rather than persons who will undermine its goals by voicing public opposition to them.

9

In *Pickering v. Board of Education*, the Supreme Court explained that because "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general," a court must "balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. 563, 568 (1968). Thus, in *Pappas v. Giuliani*, 290 F.3d 143 (2d Cir. 2002), we considered whether the New York City Police Department could terminate a police officer for making racist and bigoted statements. We determined that even if the officer had the constitutional right to engage in bigoted speech, and therefore could not be prohibited by law from doing so, "[t]he restrictions of the First Amendment do not require the New York City Police Department to continue the employment of an officer whose dissemination of such racist messages so risks to harm the Department's performance of its mission." *Id.* at 147. Similarly, in *Locurto v. Giuliani*, 447 F.3d 159 (2d Cir. 2006), we concluded that the New York City Police Department and the Fire Department of New York did not violate the law in terminating employees for engaging in a racist performance as part of a parade. We held that "the defendants' interest in maintaining a relationship of trust between the police and fire departments and the communities they serve outweighed the plaintiffs' expressive interests." *Id.* at 183.

The interests of an employer may be particularly weighty if the employee in question holds an executive or policymaking position. The balance shifts in this manner because "the

10

expressive activities of a highly placed supervisory, confidential, policymaking, or advisory employee will be more disruptive to the operation of the workplace than similar activity by a low level employee." *McEvoy v. Spencer*, 124 F.3d 92, 103 (2d Cir. 1997). In *Lewis v. Cohen*, we noted:

> The dilemma faced by a public employee who privately disagrees with his superiors on matters of public policy is not an uncommon one. A well-respected senior policymaking employee with public speaking responsibilities who objects to a position held by his superior frequently may be forced to choose between speaking out in favor of his supervisor's program and keeping his job, or voicing his personal opinion and perhaps losing his job.

165 F.3d 154, 166 (2d Cir. 1999); *see Kaluckzy v. City of White Plains*, 57 F.3d 202, 210 (2d Cir. 1995) ("Neither the Constitution nor the *Pickering* balancing test requires a public employer to entrust an adversary or critic with a sensitive, confidential or policy role."); *see also Elrod v. Burns*, 427 U.S. 347, 368 (1976) (Brennan, J., announcing the judgment of the Court) (stating that although a public employer may not terminate a nonpolicymaking employee solely on the basis of his political affiliation, that prohibition may not apply in the case of a policymaking official).

It is uncontested that Faghri repeatedly and publicly opposed the policies of the university administration. He spoke out in opposition to the campus in Dubai. He spoke out against the closure of certain academic programs. He accused the administration of mismanaging funds. He publicly opposed the university's position on CCAT and communicated his opposition to state and federal lawmakers. He opposed the university's position regarding

the audit of federal funds. And he criticized the university for creating an unsupportive research environment. In fact, Faghri's claim is based on his public opposition to the administrative policies of the university, as he contends he was demoted because of his exercise of his constitutional right to voice that opposition. If the facts are as he alleges them to be, then Defendants are entitled to qualified immunity because they had no obligation to retain in a management position, especially a high-ranking executive position, one who publicly opposed the university management's policies. We conclude that at the very least, there was no clearly established law which prohibited Defendants from removing Faghri from his deanship.

Our conclusion might well be different had the university fired Faghri from his professorship. The reasoning of our decision depends upon the fact that it was from a management position that the university removed him. We do not suggest that a public university can fire a teacher for voicing opposition to university policy. Faghri, however, lost only his position on the university management team; he retained his chaired professorship. His vocal opposition to university policies entitled the university management to remove him from the deanship.[1]

---

[1] We note that Defendants deny that it was because of his opposition to university policies that they demoted Faghri from the position of dean. Defendants claim it was because he caused controversy and alienated a considerable portion of the faculty. The district court found that an issue of material fact existed regarding "whether the defendants would have removed [Faghri] from the deanship regardless of the content of his statements." *Faghri*, 608 F. Supp. 2d at 277. **A 1719.** However, this issue of fact is not material. The difference between Plaintiff's factual contentions and Defendants' is of no moment for his First Amendment claim. If the university demoted him for reasons other than his speech, he has no claim under the First Amendment. And if it demoted him for opposing university policy, as he alleges, his claims fail

Faghri had no clearly established right to remain as dean while voicing opposition to the policies of the team he was hired to be part of. We therefore reverse the judgment of the district court and grant summary judgment to Defendants on Faghri's First Amendment claim.

**II.     Faghri's due process claim**

The district court determined that summary judgment was inappropriate on Faghri's due process claim because issues of material fact existed regarding whether Faghri had a property right in his deanship. We disagree. Even assuming he had a property right and was accordingly entitled to some process, no clearly established law required the university to give Faghri more process than he received. We conclude that the district court erred in denying Defendants' motion for summary judgment on Faghri's due process claim as well.

Under the Fourteenth Amendment, "No State shall . . . deprive any person of . . . property, without due process of law." A public employee who may be dismissed only for just cause has a property right in his employment. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538-39 (1985); *Ciambriello v. County of Nassau*, 292 F.3d 307, 313 (2d Cir. 2002). Where a public employee has a property interest in employment in a particular position, that employee cannot be terminated or demoted without due process. *Ciambriello*, 292 F.3d at 317-18.

The due process clause requires a government employer to provide "notice and opportunity for a hearing" before terminating an employee with a protected property interest in his employment. *Loudermill*, 470 U.S. at 542 (internal quotation marks omitted). In such a

as well, for the reasons explained in the text above.

13

hearing, the "employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id.* at 545-46. However, "the requisite hearing is a minimal one," *Locurto v. Safir*, 264 F.3d 154, 173 (2d Cir. 2001), designed to serve as "an initial check against mistaken decisions," *Loudermill*, 470 U.S. at 545. It need not be conducted before a neutral decisionmaker, *Locurto*, 264 F.3d at 174, and it is not intended "to resolve the propriety of the discharge," but to "ensur[e] there are reasonable grounds to find the charges against an employee are true and would support his termination," *id.* at 173-74.

Where a government employer demotes an employee, rather than terminating him, "[t]he determination of whether [he] is entitled to a pre-deprivation hearing is fact-specific." *Ciambriello*, 292 F.3d at 319. This determination – and the determination of the extent of the process required in such a hearing if the employee is entitled to one – involves balancing the respective interests of the employee and the employer. The Supreme Court instructed in *Matthews v. Eldridge*, that a court consider:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. 319, 335 (1976); *see also Monserrate v. New York State Senate*, 599 F.3d 148, 159 (2d Cir. 2010) ("The timing and nature of the required hearing will depend on appropriate

14

accommodation of the competing interests involved." (internal quotation marks omitted));
*Ciambriello*, 292 F.3d at 320.

Faghri does not claim that his contract rights entitled him to keep his position or be paid damages for his removal. He has not brought a claim of breach of contract. With respect to this cause of action, he claims only that his contract (because it omitted the "serve at the pleasure of" clause) gave him a limited property interest, which entitled him to some kind of predeprivation process. Assuming he is correct that he was entitled to *some* predeprivation process, the deprivation was minimal. His interest in retaining his deanship (over and above his professorship, which he retained) was only incremental and must be balanced against the university's interest in having a senior executive and policymaking position filled by one who was not bent on undermining the university's policies and was not a lightning rod of controversy in the faculty.

Given this balance of interests, we know no clearly established law suggesting that Faghri had a right to more predeprivation process than he received. Even upon termination of an employee having a property interest in his position, the employee is entitled only to "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Loudermill*, 470 U.S. at 546. Faghri (who was not terminated, but merely demoted) received oral notice of the university's intent to remove him from the deanship, a brief explanation of the university's evidence, and an opportunity to be heard. Nicholls summoned him to a face-to-face meeting and told him the university's reason.

15

Faghri had the opportunity in that meeting and immediately afterward to respond. As a sophisticated actor holding a prominent position in the university hierarchy, Faghri was well-equipped and well-positioned to make use of that opportunity. Any significant delay to afford Faghri more time to construct a response, during which time he would remain in his position, would have been detrimental to the university's interest in its efficient governance. Faghri furthermore did not request additional time to mount a defense or present explanations. No clearly established constitutional law required the university to provide additional predeprivation process to such a management and policymaking employee in these circumstances. Defendants Austin and Nicholls were therefore entitled to have the case dismissed on the basis of qualified immunity.

**CONCLUSION**

For the foregoing reasons, the judgment of the district court is REVERSED and the case remanded to the district court with instructions to enter judgment for Austin and Nicholls on the basis of qualified immunity on Plaintiff's First and Fourteenth Amendment claims.